[No. S038073. Dec. 5, 2005.]

THE PEOPLE, Plaintiff and Respondent, v.
ABELINO MANRIQUEZ, Defendant and Appellant.

## COUNSEL

Lynne S. Coffin and Michael J. Hersek, State Public Defenders, under appointment by the Supreme Court, and William Hassler, Deputy State Public Defender, for Defendant and Appellant.

Bill Lockyer, Attorney General, Robert R. Anderson, Chief Assistant Attorney General, Pamela C. Hamanaka, Assistant Attorney General, John R. Gorey and Sharlene A. Honnaka, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**GEORGE, C. J.**—Following the guilt phase of the trial, a Los Angeles County jury found defendant Abelino Manriquez guilty of the murders of Miguel Garcia, George Martinez, Efrem Baldia, and Jose Gutierrez, each murder having been committed on a separate date. (Pen. Code, § 187, subd. (a).)[1] As to each of the crimes, the jury found that defendant personally used a handgun. (§§ 1203.06, subd. (a)(1), 1192.7, subd. (c)(8).) The jury found true the special circumstance of multiple murder. (§ 190.2, subd. (a)(3).)

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

At the conclusion of the penalty phase, the jury returned a verdict of death. This appeal is automatic. (Cal. Const., art. VI, § 11; § 1239, subd. (b).)

We affirm the judgment in its entirety.

## I. GUILT PHASE EVIDENCE

### A. The Prosecution's Case

#### 1. Overview

On January 22, 1989, at approximately 4:40 a.m., defendant was a patron at the Las Playas restaurant, located in Paramount. An argument ensued between defendant and Miguel Garcia, ending when defendant shot Garcia several times, after which defendant departed from the premises.

On February 22, 1989, at approximately 10:00 p.m., defendant was a patron at Fort Knots, a topless dance bar, located in South Gate. While Daneen Baker, one of the dancers, performed on stage with her back to the audience, she felt a customer touch her thighs. Such conduct was prohibited, and believing that defendant had touched her, she asked the doorman, George Martinez, to evict him. Martinez did so, after which defendant attempted to reenter the bar on several occasions that evening, finally returning with a firearm and fatally shooting Martinez at point-blank range.

On November 29, 1989, at approximately 2:00 p.m., defendant and his girlfriend, Sylvia Tinoco, were drinking beer and ingesting cocaine at the Rita Motel, located in Compton. Efrem Baldia (occasionally referred to by witnesses by his nickname, "Arnulfo") drove to the motel and defendant, knowing that Baldia had been romantically linked to Tinoco, left the motel room looking angry, confronted Baldia (who was unarmed) in the motel parking lot, and fatally shot him.

On January 21, 1990, shortly after midnight, defendant was drinking beer at the Mazatlan Bar, located in Compton. Defendant approached the bar to order another beer and encountered Jose Gutierrez, who, according to one witness, had been sitting at the bar, asleep, with his head resting on his arm. Defendant grabbed Gutierrez by the neck and shot him repeatedly.

Approximately one month later, on February 22, 1990, law enforcement officers arrested defendant at the Charter Suburban Hospital, located in Paramount, where he was being treated for a fresh gunshot wound in the shoulder.

## 2. *The Murder of Miguel Garcia, January 22, 1989*

John Guardado testified that after leaving a nightclub after 2:00 a.m. on January 22, 1989, he "ran into a couple of friends [Miguel Garcia, whom Guardado knew only as 'Kaliman,' and John Dorame] on the street where we hang out at." Garcia and Dorame asked Guardado whether he wanted to go to the Las Playas restaurant, and Guardado joined his friends in walking there. Having already consumed beer and a "lot of mixed drinks" at the nightclub, Guardado described his own condition at the restaurant as "exhausted" and "dazed out, drunk." At approximately 4:40 a.m., Guardado observed a "medium-buil[t]" man wearing a gray "Spanish style" suit walk by him, pull a gun from his waistband, and cock it. He then heard six or seven shots. Guardado did not see the man's face, nor did he see him actually fire the gun. After the shots were fired, Guardado saw the assailant run out of the restaurant. Guardado ran toward the door, turned around, returned to the victim, felt him, and then departed. He explained: "He was dead. I closed his eyes, and I left. Because I was on probation."

Guardado believed the weapon had been a "chrome gun," and when shown People's exhibit No. 7, a darker firearm recovered from defendant that the prosecution theorized had been the murder weapon, Guardado testified that he did not recognize it. Guardado denied recognizing the shooter in a pretrial photo lineup, nor could he identify the shooter at trial.

Angelica Contreras, a waitress at the Las Playas restaurant, testified that in the early morning of January 22, 1989, the victim and a few other individuals came into the restaurant. The victim told her to serve his friends and said he would pay for everything.[2] After Contreras served the men, she returned to their table a few minutes later to find the victim arguing with another patron, a man she knew only as "El Gatito." Contreras told the men to stop arguing and to pay her. The victim did so. Contreras thereafter went to a storage room and then heard some gunshots; when she emerged immediately thereafter, she saw the victim lying on the floor. She observed persons running toward the door, including one man (whom she recognized from his previous visits to the restaurant) holding a black gun in front of his chest with his arms almost completely extended.

Contreras acknowledged not telling the police everything when they initially interviewed her, because the restaurant manager told her, "If I did not want to have any problems not to say anything." Contreras subsequently identified defendant in a pretrial photographic lineup as the person she saw

---

[2] At the time of defendant's trial, Angelica Contreras could not be located; the prosecution therefore introduced the relevant portion of her videotaped testimony given at the preliminary hearing.

holding the gun, and at the preliminary hearing she again so identified defendant. Contreras also testified that People's exhibit No. 7, a .380-caliber Llama semiautomatic pistol, resembled the gun she had observed in defendant's possession.

Laura Lozano, a waitress at the Las Playas restaurant, testified she was in the kitchen when the shooting occurred. She directed the restaurant manager, a man whom she knew only as "Santos," "to take a look and see what had happened," but Santos "said that he wouldn't go." Lozano looked toward the cashier and saw several persons leaving the restaurant, including one man who carried a gun; however, she did not observe the person's face. She acknowledged untruthfully telling police investigators ("out of fear") that she had not witnessed the foregoing events, and for a similar reason misled the investigators when they showed her a photographic lineup, informing them that she did not recognize anyone when in fact she had recognized one of the individuals depicted—defendant—as someone she saw at the restaurant shortly before the shooting, exchanging words with the victim and telling him to "leave me alone, I have nothing to do with you."

Ronald Riordan, a detective employed by the Los Angles County Sheriff's Department, testified that he arrived at the Las Playas restaurant at approximately 6:30 a.m. on January 22. Riordan recalled that the victim's body bore separate gunshot wounds to the right eye, right chin area, right neck area, upper left chest, right lower back, and left groin area. Riordan also testified that he attended the autopsy of the victim, that all of the victim's wounds were consistent with having been inflicted by a .380-caliber firearm, and that there was no evidence indicating a different weapon had been used. Riordan recalled interviewing witness John Guardado on the day of the murder; contrary to Guardado's testimony at trial (in which he recalled seeing a "chrome gun"), during the interview Guardado described the murder weapon as "a blue steel automatic pistol."

Dr. Christopher Rogers, a Los Angeles County Deputy Medical Examiner, testified regarding the autopsy performed on Miguel Garcia. Rogers explained that the cause of death was multiple gunshot wounds. The victim's blood was determined to have "contained alcohol, cocaine, and a substance related to cocaine."

Donald Messer, a Long Beach police officer, testified that on March 2, 1989, he responded to a "shots fired" call at the La Ruleta bar, located in Long Beach. Shortly after he and other officers arrived at the bar, Messer observed one of his colleagues pull a handgun from defendant's waistband, which precipitated a struggle between the officers and defendant. The officers eventually handcuffed defendant and placed him under arrest. At trial, Messer

identified People's exhibit No. 7 as the firearm confiscated from defendant, and testified that the weapon was loaded at the time.

Officer Messer added that, during the booking process, officers discovered in defendant's jacket pocket a "dollar bill folded up into a bindle that we booked . . . as appearing to contain cocaine." A similar bindle made from a folded dollar bill was recovered from the Las Playas crime scene; criminalists employed by the Los Angeles County Sheriff's Department examined both bindles and confirmed that each one contained cocaine residue, a fact to which the parties stipulated at trial.

Dwight Van Horn, a deputy sheriff and firearms examiner employed by the Los Angeles County Sheriff's Department, testified that, based on the ballistics testing he conducted in April 1989, the bullets recovered from the victim's body during the coroner's investigation and the shells recovered from the crime scene were fired from the Llama .380-caliber semiautomatic pistol seized from defendant at the La Ruleta bar.

John Laurie, a Los Angeles County Deputy Sheriff, testified regarding an interview with defendant (conducted with the assistance of a Spanish-speaking detective, Deputy Joe Olmedo, who served as an interpreter), at the Los Angeles County jail on February 24, 1990. At the time of the interview, Laurie informed defendant he "had been identified as the suspect in [the Garcia] murder, and . . . had been arrested on a warrant based on that incident." After advising defendant of his constitutional rights, Laurie further informed defendant that he was in jail in connection with the murder committed at the Las Playas restaurant, and asked defendant to comment upon that.

Laurie testified defendant replied that he had gone to the Las Playas restaurant with a friend named Francisco Manzano, that the victim had tried to pick a fight with defendant, that defendant said he did not want to fight, and that a short time later, as defendant and Manzano were getting up to leave the restaurant, the victim attempted to pick a fight with defendant a second time, at which point Manzano shot the victim with a .380 semiautomatic pistol. Defendant admitted having been armed with a nine-millimeter semiautomatic handgun that evening and recalled having used that weapon to hold the other patrons at bay while the shooting occurred. Laurie added: "Mr. Manriquez told Detective Olmedo that he would have shot this person but he didn't have to because his friend had already shot him."

On cross-examination, Laurie testified that he doubted defendant's version of the events, in part based on information Laurie had obtained from other witnesses to the Las Playas shooting and in part because the investigation

revealed defendant had used the alias "Francisco Manzano" on the occasion of "at least four other arrests."[3]

Laurie, who did not understand the Spanish language, acknowledged lacking personal knowledge as to what defendant said during the interview, instead basing his trial testimony upon the notes he made of his conversation with Detective Olmedo, who acted as the interpreter. Laurie also confirmed that defendant denied shooting the victim at the Las Playas restaurant.

### 3. *The Murder of George Martinez, February 22, 1989*

Daneen Baker, a waitress and dancer at the Fort Knots bar, a topless dance establishment located in South Gate, testified that on February 22, 1989, at approximately 8:00 p.m., she was dancing on stage when a patron "reached up and touched me on the back of my thigh," a violation of the establishment's policy. Recalling that she was angry, Baker "bent down and I looked in his face, and I told him, 'Don't you ever touch me.' And at that time I called over George [Martinez], [who] was the doorman, and I told him to get him out of there, I said because he's touching me. . . . and I grabbed my top and I got off stage." Martinez approached the patron, told him he had to leave and, with the help of the manager of the bar, escorted the customer from the premises. Baker remembered the patron's face "very well" and identified him in a pretrial lineup and at trial as defendant.

Approximately 90 minutes after this incident, Baker again was dancing when she heard gunshots, causing her to jump from the stage and hide near the jukebox. Baker did not see who fired the gun, but shortly thereafter saw Martinez "laying on the floor and he wasn't moving."

Mario Medel testified that he was employed as the manager of Fort Knots on the evening of the shooting. He recalled responding to Baker's complaint "that there was a patron reaching over the chain" and touching her. Because the patron indicated he did not understand English, Medel asked George Martinez to speak with him in Spanish. When the patron refused Medel's request to leave, "we forcibly had to escort him out." Outside, when Medel and Martinez attempted to explain to the patron why he was being thrown out, he "took a swing" at Medel, prompting Medel to hit him in the face.

---

[3] Ronald Dechamplain, a California Highway Patrol Officer, testified that on January 6, 1990, he initiated a traffic stop at approximately 2:05 a.m., believing the driver of the vehicle may have been driving under the influence of an alcoholic beverage. The driver gave his name as "Francisco Manzano" but was unable to produce any identification. After being arrested, the driver signed "Francisco Manzano" on the booking form. At trial, Dechamplain identified the driver as defendant.

Medel and Martinez returned to the bar. When the patron reentered the establishment, Medel and Martinez "pushed him out. We just kept telling him, 'Go on home. You had too much to drink. We told you, you can't touch the girls. Just leave.' "

Shortly thereafter, the patron returned again to the bar. Medel was in the back office, and "[o]ne of the girls came running back and said, 'George is outside again with that guy.' So I locked up the office, went outside, and George was wrestling with the guy. I broke that up. . . . and instructed George to go back inside. I was out there arguing with the guy. That's when . . . he started talking about coming back with a gun. I just kind of like blew it off, because you hear it all the time in this business. So then I went back inside, and I stayed there with George again."

Medel did not believe the patron would return, but "he came back again [and] . . . . I physically threw him out. Literally just threw him out." Medel returned to the back office, and "[a]gain, they came back and told me George was outside in a fight. So I ran out there. If I remember right, he kind of like had George around the waist. . . . And George hit him with his [plastic] flashlight. . . . So when I broke it up, he turned around and swung at me again; and I swung at him and hit him. He went backwards and . . . his head hit the little wall, kind of knocked him out a little bit."

An unmarked police car arrived, Medel explained the problem to the officers, and they told the patron to leave. Observing the patron walk down the street, Medel reentered the bar.

Medel further testified: "So then something told me to go around back and get up on top of the roof to see what was going on. I went on top of the roof, and I was looking down, and I noticed a white Camaro drive up. They opened the back hatch, and two guys were going through the back looking for something. . . . So when I saw that, I came down off the roof; and me and George closed the front door. I was sitting there on the stool . . . , and George was standing against the mirrors. . . . And the next thing that happened was the guy—the door opened. George was looking down the hallway. Then he kind of turned to me; and he says, 'Mario, he is back.' The guy started walking up the hallway. . . . I saw this in the mirror. He had a brown coat on. He reached inside his coat, just point blank just shot George with the first bullet. When I saw the first round go off, me and another patron just kind of like swung around behind the cigarette machine. Then I heard a second round go off, and that was it. Waited a few moments, got up, went to see George. George was staggering at me, and the guy was gone. . . . At first he [Martinez] was kind of like holding onto himself. He was starting to fall, so I caught him and laid him down. . . . I went out this side door very cautiously

and went and looked around the side of the building to see if the patron was still out there. Himself and the car [were] gone. I ran back inside and called 911 to get help for George."

Medel testified he saw the patron's face during each one of the arguments outside the bar, and that it was reflected in the mirror when the patron returned with the gun, which Medel saw him remove from underneath his jacket, "probably in his waistband." In a pretrial photographic lineup, at the preliminary hearing, and at trial, Medel identified the patron as defendant.

On the evening of the shooting, Mark Herbert was a patron at Fort Knots. Herbert's testimony was substantially similar to that given by Mario Medel, namely that a dancer complained a patron had touched her; the patron, who was argumentative, was escorted out, only to return repeatedly and scuffle with the doorman; and eventually two gunshots were heard and the doorman fell, mortally wounded. In a pretrial photographic lineup, at the preliminary hearing, and at trial, Herbert identified the argumentative patron as defendant. Herbert, however, did not see who fired the weapon.

Barbara Quijada, a waitress and dancer employed at Fort Knots, began her shift approximately one hour prior to the shooting and was unaware of the disturbances involving defendant. Quijada testified that immediately prior to the shooting, she was speaking with George Martinez about his baby. She saw a man walk toward Martinez, which led Martinez to declare: "Hey Mario, there's that guy again." Quijada saw the man open up his jacket, "reach like for a wallet, . . . there was a real like rapid fire, pop, pop, pop, and a whole bunch of smoke." Quijada saw Martinez "holding his chest and sliding down the . . . wall . . . ."[4]

Immediately after the shooting, Quijada crawled to a "far bathroom," where she "started shaking apart." Hearing someone yell for a paramedic, Quijada, who previously had received training as an emergency medical technician, splashed water on her face "and pushed my way through the girls and all the men around and told them that I was the closest they were going to get to a paramedic for the moment. . . . I had to break through a mound of people hovering over him, and for someone that was shaking apart to an extreme I took charge as fast as I could. . . . I got him some air. I pushed everybody out of his way, and I elevated his head and opened his airway and

---

[4] On cross-examination, Quijada testified that a period of "minutes" elapsed between the moment Martinez saw defendant enter the bar just prior to the shooting, and the firing of the shots. Defense counsel thereafter impeached this aspect of her testimony with her preliminary hearing testimony, in which she described the elapsed time as "not even minutes. . . . It was just all in one movement, him walking in, this opening up, and the smoke . . . ."

started monitoring his vitals. . . . [I]t was a dead-on heart shot. . . . The kind of heartbeat I was getting was not close to normal. . . . My friend was on his way out."

Quijada further testified: "When his vitals [reached] a severe point I very calmly told him to hold on, not to get any more scared but I was going to have to help him breathe for a little while until the ambulance got there. And I closed my eyes and asked if by chance was there anyone else in this bar that could handle two-man C.P.R. other than me. And there was a real firm hand on my shoulder, and I looked up, and I was surrounded by policemen. One officer told me that they had been there for five to 10 minutes. And I asked, 'Why didn't you help me?' They told me that there was nothing that they could have done any better than what I had because he left with nice thoughts."

Because Quijada had been standing near the mirrored entryway when the shooting occurred, she saw the shooter "from every angle." She recalled that the man's face "looked like he had taken a few punches." As part of the police investigation, she assisted in the production of a composite illustration of the shooter, which she testified was a "very close" likeness of him.

Quijada identified defendant in a pretrial photographic lineup; asked why she picked that photograph, Quijada testified, "Because that's the face that's been haunting me. That's the face I've tried to forget. . . . There is no doubt in my mind. I was too close and it was too much of a traumatizing series of actions for me to ever, ever forget it." She also identified defendant at the preliminary hearing and at trial. Asked why she refrained from looking at defendant during her testimony, Quijada responded: "I can't. It's haunted me too long. I tried very hard to put the face out of my mind, and it's very painful. . . . Seeing him in person . . . only confirms a nightmare that I have been living with for a long time."

Dr. Rogers testified regarding the autopsy performed on George Martinez. Rogers described the cause of death as "gunshot wounds of the chest." On cross-examination, Dr. Rogers testified that the autopsy report indicated the likelihood that the victim's four wounds (including two that appeared on the victim's hands) likely were the result of only two gunshots.

Renold Verdugo, a Los Angeles County Deputy Sheriff, testified regarding his participation as one of the investigating officers in the aftermath of the shooting at the Fort Knots bar. Verdugo testified that the crime scene yielded two expended shell casings, determined to have been fired from the same nine-millimeter firearm. One bullet was recovered the following day from the crime scene; the other was found during the coroner's autopsy performed on

the body of George Martinez, which Verdugo attended. Verdugo also supervised the collection of blood evidence (none of which subsequently was determined to have matched defendant's blood) and interviewed various witnesses.

On cross-examination, Verdugo testified that Mario Medel described the person who was thrown out of the bar as having been a "male Hispanic possibly in his 20's or 21 years old, five five to five six, I believe it was a hundred and forty pounds, dark hair and a short trimmed mustache. He also described [the suspect] as having a roundish face[, and] Americanized, one who possibly was here long enough to, let's say, have papers. Those were his impressions. Not a recent illegal alien or an undocumented alien."

In the ensuing months, Verdugo and law enforcement officials who were investigating defendant's possible involvement in another case, compared defendant's photograph with the composite drawing made with the assistance of Barbara Quijada, noted the resemblance between the two, and recontacted the Fort Knots witnesses for the purpose of showing them a photographic lineup that included defendant's image.

Gerald Jansen, a Los Angeles County Sheriff's Department Homicide Inspector, testified that he showed the photographic lineup to certain witnesses to the Martinez killing. Barbara Quijada selected defendant's image from the lineup. On cross-examination, Jansen recalled that Mario Medel did not select anyone from the lineup, and one other witness was unable to choose between the image of defendant and that of another individual.

### 4. *The Murder of Efrem Baldia, November 29, 1989*

Nicolas Venegas testified he was employed as a caretaker and beer-delivery person at the La Luciernaga bar, located in Compton, an establishment occasionally frequented by defendant. Venegas recalled seeing Sylvia Tinoco, who also worked at La Luciernaga, speaking with defendant on a few occasions, and that the two appeared to have a boyfriend-girlfriend relationship. Venegas also recalled that Tinoco appeared to be "going around" with Efrem Baldia, whom Venegas knew as "Arnulfo."

On November 29, 1989, Venegas drove Tinoco to see defendant at the Rita Motel, where he was staying in room 23. That morning, the three drank beer and ingested cocaine in defendant's room; on the bed was a bag that Venegas believed contained kilos of cocaine. Defendant asked Venegas whether he knew anyone who "wanted to buy the coke." Venegas did not respond. Beneath the pillow on the bed was a .45-caliber firearm.

Not feeling well, Venegas walked outside to the parking lot, at which point Efrem Baldia drove into the lot with another individual, parked his car, and

began conversing with Venegas. Sensing the possibility of trouble in view of Tinoco's concurrent relationships with Baldia and defendant, Venegas suggested that Baldia depart from the premises: "I told him that I knew it was gonna be some problems up there, so I just tell him to just go—don't stay there, just drive in his car and, 'better get out of here,' I told him. . . . [B]ecause [Baldia] was going around with Sylvia. . . . I knew Lino [that is, defendant]. . . . I didn't know how he was gonna react. I seen the gun up there in the room. So I just tell him to just split, and he don't want to. . . . I just told him to split from right there where he was. I told him Lino was right there. I just told him to go, and he didn't want to go. He stayed there. . . ."

Venegas further testified: "[Within five minutes,] I see Lino was coming out of that room. And I just told the other guy just to split, and I went to another room," next door, where Venegas knew that other friends were staying. Shortly after entering that room, Venegas heard three or four gunshots. He stayed in the room for "about eight minutes," then saw a white car, similar to one he had seen defendant drive, depart from the premises. Venegas called Tinoco, and the pair immediately left, because Venegas "didn't want any problems up there."

In his testimony at trial, Venegas recalled seeing Baldia and defendant conversing with each other prior to the shooting, but did not know what they were saying. He did not see the shooting and could not recall whether he shortly thereafter saw a body. He never saw defendant or the victim holding a gun. He acknowledged fearing for his safety and that of his family in connection with his testifying in court.

Ramiro Salazar (occasionally referred to in the record as "Ramiro Salazar Gamboa") had been employed at the La Luciernaga bar, was acquainted with Sylvia Tinoco, and had seen her in the company of defendant and Baldia. He believed Tinoco was having simultaneous relationships with each of the men.

Salazar testified that he accompanied Baldia to the Rita Motel on November 29, 1989, at approximately 2:00 p.m. Shortly after Baldia exited from the vehicle and spoke with Venegas, defendant emerged from one of the motel rooms, calling Baldia toward the room. Baldia declined. Defendant and Baldia conversed briefly.

Salazar testified initially at trial that he did not hear what Baldia and defendant were saying and did not see them push each other or fight. The prosecutor thereafter asked the witness whether he had informed the investigating law enforcement officers that defendant appeared angry upon emerging from the motel and had grabbed Baldia, and Salazar acknowledged that he had so informed the officers. Salazar acknowledged telling the officers that

Baldia asked defendant, "Why are you mad at me?" after which defendant let Baldia go and Baldia backed up with his hands in the air, asking defendant, "What's your problem with me?"[5]

Salazar saw defendant unbutton his shirt, pull a pistol from the area of his waistband, and fire at least three times at Baldia from a distance variously described as "maybe some six feet," "six to seven feet," "three meters," 12 to 15 feet (estimate offered by the court in attempting to characterize the witness's description), and (on cross-examination) as "somewhat far away."

On cross-examination, Salazar testified he saw defendant pull out the firearm, but Salazar explained he looked away at that point and did not actually see the shooting, although he immediately heard the shots. Salazar later testified he was looking at defendant when the shots were fired. Neither Salazar nor Baldia was armed with a weapon, and no weapon was located in the car driven by Baldia.[6]

Immediately after the shooting, defendant drove away in his vehicle. Salazar departed to call an ambulance, returning a few minutes later.

Salazar admitted giving investigating police officers and detectives a false name, "Antonio Sain," because he was nervous and frightened after having told them who had committed the killing. Salazar denied telling the officers that defendant had threatened to kill him; the prosecutor then read into the record Salazar's testimony given at the preliminary hearing, in which Salazar stated the reason he feared defendant was "because he was going to kill me," and "I shouldn't call the police, that if I called the police he was going to kill me." Salazar denied fearing coming to court to testify.

Cheryl Lyons, a Los Angeles County Deputy Sheriff, testified that she was one of the investigating officers who responded to the homicide at the Rita Motel. Lyons identified expended shell casings that were recovered from the parking lot, testifying that ballistics tests revealed all the shell casings to have been fired from the same .45-caliber weapon.

Lyons further testified that during her interview with the witness who identified himself as "Antonio Sain" (that is, Ramiro Salazar), he told her the

---

[5] Asked on redirect examination when was it that Baldia had declared he "had no problem with" defendant, Salazar replied, "I don't remember if he had said anything. It's been a long while now." Asked on recross-examination when was it that Baldia raised his hands (described by the court as "at just shoulder level with the palms forward"), Salazar replied, "When the first shot was fired," which (Salazar testified on further redirect examination) meant "after the first shot."

[6] Testifying on cross-examination, Salazar explained that although Baldia usually carried a gun, he knew Baldia was unarmed on the date of the shooting because the police recently had confiscated Baldia's firearm.

following: "[A]s the victim was parking the car, they saw the suspect, and that the victim got out of the car, went around to the back of the car and put his hands up . . . making statements, 'I don't want any trouble,' speaking to the suspect. And then . . . the suspect grabbed the victim by the shirt; and then the victim started backing up . . . away from the suspect. . . . And the suspect took a silver—or a metallic, he said—a light-colored gun—he unbuttoned his shirt, took it from his waistband, and fired at him several times at close range. . . . [The witness] said he was told by the suspect . . . 'Don't talk to the police,' or, 'Don't tell the police.' [The witness said he lay] down on the front seat of the car for fear of his life." On cross-examination, Lyons testified that, in her report of the interview, the firearm was identified as a semiautomatic pistol, and that Baldia asked defendant, "What is your problem with me?"

Beatriz Escamilla testified that she and her husband, Jose Campista, were residing at the Rita Motel on the day of the shooting, that she believed but was not certain that Campista was defendant's uncle, and that she knew defendant, Sylvia Tinoco, Nicolas Venegas, and the victim. Escamilla was in her room when she heard gunshots; because her child was outside, she looked out the window, and she saw defendant drive away in his vehicle, "which was right next to the person [who] had been shot," and also saw Tinoco and Venegas depart from the premises.[7]

Dr. Rogers testified regarding the autopsy performed on Efrem Baldia, and described the cause of death as having been multiple gunshot wounds. None of the wounds indicated that the gun was fired directly in front of the victim. The victim's body bore a small amount of benzoylecgonine, a substance related to cocaine.

Alan McRoberts, a Los Angeles County Sheriff's Department Latent Print Examiner, testified that he matched defendant's fingerprints to those found on two of the kilo-sized packages that Nicolas Venegas saw in defendant's room at the Rita Motel. McRoberts further testified that the packages had "a distinct odor"—"a smell of cheese that was deteriorating and becoming quite rank." Kelley Archer, a Los Angeles County Deputy Sheriff and one of the first law enforcement officers to arrive at the crime scene, initially believed the packages contained kilos of drugs, and caused them to be examined at the

---

[7] Gerald Burks, a Los Angeles County Sheriff's Department Homicide Inspector, testified that shortly before Escamilla took the witness stand at the trial, he heard a conversation in the district attorney's office, with the use of an interpreter, in which Escamilla stated that when she heard the gunshots, "she looked out the window, [and] saw defendant with a gun in his hand." Burks also testified he saw Escamilla "wink with her right eye" to defendant after taking the oath and prior to giving her testimony. On cross-examination, Burks testified he was aware that Escamilla and defendant were friends. Escamilla denied winking at defendant, testifying: "The only thing I did is just—I smiled with him."

Lynwood sheriff's station. In the course of that examination, investigators discovered that the packages contained "provolone cheese laced with cocaine on the top . . . ."

### 5. The Murder of Jose Gutierrez, January 21, 1990

Beatriz Escamilla, who testified regarding the shooting at the Rita Motel, also testified regarding defendant's involvement in the shooting death of Jose Gutierrez at the Mazatlan Bar, located in Compton, at approximately 12:40 a.m. on January 21, 1990. Escamilla, who was employed at the bar as a cashier, was not working on that occasion, instead having gone there "to drink some beers," and had been there for "several hours" prior to the shooting. Defendant was sitting at a table, drinking beer. Escamilla "chatted with" defendant, who did not appear to be drunk; on cross-examination, she acknowledged having offered to "take some beers to him," to which defendant replied, "No, I will go get them myself."

Shortly after midnight, defendant walked from his table to the cashier behind the bar, and requested more beer. At approximately the same time, "the young man who died, he came out of that other corner to ask for beers. This young guy got close to [defendant], and [the victim] went directly to [defendant] and started offending him. . . . The man started to ask [defendant] if he had a pistol, to take it out and use it; and he started insulting him, you know, his mother. And Lino told him to calm down, that he didn't want any problems. He said [that] to him two or three times. And that's what happened with that young man."[8]

---

[8] The prosecutor and the witness engaged in the following colloquy:
"Q.: Tell us what the young man said to Lino [defendant].
"A.: You want all the words?
"Q.: I want all the words. I want to know what the young man said to Lino.
"A.: The young man came over to Lino, and he asked him if he had a pistol, 'Take it out and use it you mother fuck [sic].'
"Q.: Did the young man call Lino, 'Mother fucker'?
"A.: Yes. And 'Take it out.' And Lino told him to calm down. He said that about two or three times to the young man.
"Q.: Lino said, 'Calm down'?
"A.: 'Calm down,' uh-huh.
"Q.: Did the young man say anything else?
"A.: He kept on saying the same thing.
"Q.: What was that?
"A.: What do you mean like what?
"Q.: Like, what did he say? He kept saying the same thing. What was that?
"A.: The same words.
"Q.: That being if—if Lino had a pistol, he should take it out and use it?
"A.: Uh-huh.
"Q.: And did Lino take out a pistol and use it?

Escamilla testified defendant repeatedly shot the man in the back, from a distance of approximately four feet. She did not see the victim attempt to grab or stab defendant or to hold a weapon, nor did he see a weapon fall to the ground.

On cross-examination, Escamilla further testified: "I just looked at Lino. I was not able to see the victim. On seeing the pistol in his hand, what was I going to do? Again, turn around and look at him, not the victim. He was about to do something." Asked if she was looking at defendant when the first shot was fired, the witness responded affirmatively.

Adela Lopez (occasionally referred to in the record as Adela Lopez Ontiveros) was employed as a bartender, waitress, and cashier at the Mazatlan Bar on the night of the shooting. She testified that defendant sat with "two or three guys . . . in the back of the bar." Lopez was familiar with defendant from his previous visits, recalling that "he used to go there all the time," and that on this occasion, he had arrived at the bar approximately 20 minutes prior to the shooting.

In response to the prosecutor's inquiry whether she saw defendant stand up at his table and appear to have a gun underneath his shirt, Lopez testified: "No. When I see him—I look because he was already shooting that person. . . . He arrived [at the bar] and touched the [victim], and the next thing I know he shot. He fired." After the first shot was fired, the victim was "thrown on the floor," and defendant "kept right on firing."

In response to the prosecutor's inquiry as to what the victim had been doing at the bar, Lopez replied: "He was asleep. . . . That person was asleep. . . . I didn't see the guy who fell down say anything." Asked whether she saw the victim holding any weapon at all, Lopez testified: "No. . . . That man had been leaning against the bar asleep for at least two hours."

Lopez further testified that immediately after the shooting, "[defendant] went out through the door. He left. And he left with a pistol in his hand and then the security went after him with their pistol[s] out."

Lopez identified defendant as the shooter in a pretrial photographic lineup and at trial.

On cross-examination, Lopez testified that immediately prior to the shooting, she saw defendant grab the victim without exchanging any words. She looked away, heard the first shot, and then "I just looked and saw the guy on

---

"A.: Yes.
"Q.: What did he do with it?
"A.: Killed the young man."

the floor, and I watched [defendant] keep on shooting him." She acknowledged leaving the bar just as the police arrived, and without speaking to the investigating officers.

Stoney Jackson, a police officer employed by the City of Compton, testified that he arrived at the crime scene shortly after the shooting and observed the victim's body lying on the floor, bearing multiple gunshot wounds. He recovered four shell casings, described as .38-caliber "super autos," that likely were fired from the same firearm. He also identified certain beer containers that had been collected for fingerprint evidence. Dwight Dobbin, a Compton Police Department investigator, testified that a left thumbprint lifted from a Budweiser can collected from the Mazatlan Bar during the investigation matched defendant's.

Dr. Rogers testified regarding the autopsy performed on the body of Jose Gutierrez. He described the cause of death as multiple gunshot wounds to the back. The victim's body had a blood-alcohol content of .30 percent, as well as a small amount of a cocaine-related substance, benzoylecgonine.

### 6.  Defendant's Arrest and Interview, February 22, 1990

Beatriz Escamilla testified that sometime in February 1990, defendant, who was armed with a pistol and had suffered a gunshot wound, arrived at her residence and requested that she and her husband take him to the hospital. Escamilla's husband did so.

On cross-examination, Escamilla testified defendant had a gun in his possession, which she recalled was the case "sometimes, not regularly."

John Laurie, one of the Los Angeles County Deputy Sheriffs who testified in connection with the investigation of the shooting at the Las Playas restaurant, testified defendant was arrested at the hospital.

Joe Olmedo, a Los Angeles County Sheriff's Department Detective (who also was fluent in Spanish), advised defendant in Spanish of his constitutional rights and, with another law enforcement officer present, thereafter interviewed defendant at the hospital emergency room, apparently after defendant's gunshot wound had been treated. The interview was conducted in Spanish. Because Detective Olmedo died (of natural causes) prior to defendant's trial, his videotaped testimony given at the preliminary hearing was played for the jury. Detective Olmedo testified that defendant was placed under arrest for the murder committed at the Las Playas restaurant.

According to Detective Olmedo, defendant denied committing any murders; however, after Detective Olmedo informed defendant that witnesses had

identified him as having committed the murder at the Rita Motel, defendant "indicated that he had killed a person by the name of Arnulfo, that is the only name he knew the person by, at that location. . . ." According to Olmedo, defendant also told him the following: "He indicated that he was staying in Room 23 at the Rita Motel and that at about 9:00 a.m. in the morning a person by the name of Sylvia Tinoco and a person [by the] name of Nicholas Venegas had arrived at the room to visit him and he said sometime in the afternoon he had heard a vehicle pull up into the parking lot and he had looked out and seen Arnulfo and a male Latin who he described as being 22 years of age in the vehicle. He said at that time he armed himself with a .45 semiautomatic pistol by placing it underneath his shirt. He said that he had heard that Arnulfo, referring to the victim, had made some threats against his life and he left the room and confronted him in the parking lot. He indicated that as he was walking towards the victim, and the victim was exiting the car, he told the victim that he wanted to talk to him. And that he basically just wanted to talk to him, didn't want any problems with him and if he wanted the girl [Sylvia Tinoco] that he could have her because his intentions, meaning Mr. Manriquez's intentions, were to return back to Mexico. At the same time he indicated that the victim was walking towards him and that the victim had indicated, 'I don't want to talk to you,' something to the effect, calling him stupid. And at that point, . . . Mr. Manriquez drew his weapon from his waistband and placed the barrel of the weapon into the victim's stomach, pushing him backwards and at the same time the weapon discharged. He said as the victim had stepped . . . backwards as the weapon discharged and at the same time he remembered what the victim had said to him and he fired several more times as the victim was falling to the ground."

Detective Olmedo further testified that he asked defendant whether the killing at the Rita Motel had anything to do with any type of narcotics transaction, and that in response defendant "said it had nothing to do with the narcotics, that it was over the young lady, over the woman [Sylvia Tinoco]."

On cross-examination, Detective Olmedo was asked whether defendant had said he had been afraid of Baldia as Baldia walked toward defendant, to which Detective Olmedo replied, "No. He—he never said he was afraid of him. And I don't recall him saying that." Detective Olmedo further testified that he did not recall asking defendant whether defendant had feared Baldia.

B. *The Defense Case*

The defense presented a minimal case during the guilt phase of the trial, comprised entirely of the testimony of Clara Miller, who was employed by the Los Angeles County Sheriff's Department, and whose testimony comprised six pages of the reporter's transcript. Miller was one of the law

enforcement officers who responded to the request for help in the immediate aftermath of the shooting of Efrem Baldia at the Rita Motel. When Miller arrived at the crime scene, she spoke in Spanish with a witness who identified himself as Antonio Sain. The witness informed her that he had driven to the motel with the victim, and that the victim had exited from the vehicle, had proceeded directly toward the motel room in which defendant was staying, and then had encountered defendant. Miller testified: "I believe [Sain] said there was an argument [that] ensued between him—between the victim and the suspect. The suspect grabbed . . . the victim by the shirt, and then the victim began to walk back towards his car. As he approached the car, the suspect called out to the victim; and the . . . victim ignored the suspect." The fatal shots ensued immediately thereafter.

## II. *PENALTY PHASE EVIDENCE*

### A. *The Prosecution's Case*

#### 1. *The Three Paramount Murders*

The prosecution presented evidence establishing defendant's involvement in three additional killings committed on the morning of February 22, 1990, the same day that defendant arrived at the hospital with a gunshot wound and was placed under arrest. On that morning, defendant and his half brother, Paciano Jacques ("Mingo") Ochoa, armed themselves with a .45-caliber handgun and a .38-caliber handgun—the latter weapon being the same firearm used by defendant at the Mazatlan Bar one month earlier—and took four kilos of cheese wrapped in tape to a residence located in Paramount. According to the prosecution's theory of the case, defendant and his half brother intended to effect a "drug rip-off," whereby they would obtain the cash from their buyers, who presumably believed they were purchasing four kilos of cocaine.

The Los Angeles County Sheriff's Department responded to a "shots fired" call at approximately 10:45 a.m. Investigating officers discovered the bodies of three persons—Solticio Martinez, Juan Parra Gomez, and Everado Cervantes—at the residence, each of the victims having suffered multiple fatal gunshot wounds. One victim was found with a nine-millimeter firearm in his waistband, the second was found with a .380-caliber firearm and a single .380-caliber expended shell beneath him, and the third victim was found unarmed in a separate room.

Nine shell casings fired from the same .38-caliber firearm that had been used in the Mazatlan Bar were found at the crime scene, as were six .45-caliber shell casings. Defendant's fingerprints and those of his half brother were recovered from beer cans found inside the entranceway of the room where the bodies were found. Investigators examined the four kilos of cheese and determined they contained "some cocaine."

Later that day, defendant arrived at the Charter Suburban Hospital with a gunshot wound to the left chest area; Kathleen Estavillo, the emergency room nurse, asked defendant where he had suffered his injury, and defendant replied, "Paramount." She explained to defendant in Spanish: "I am very glad it happened in Paramount as opposed to Compton. If it happened in the City of Compton, it could be hours before a police agency would be here to interview you." Approximately one-half hour later, Estavillo overheard defendant inform a deputy sheriff that he had been wounded by a "Black man in the City of Compton."

Defendant's hospital armband bore the name, "Norberto Marquez Nevarez." His wallet contained identification for "Abelino Martinez." An investigating officer at the hospital, who previously had seen defendant's picture, recognized him, however, and defendant, for whom a warrant already had issued in connection with the La Playas restaurant murder, was arrested.

### 2. The Rape of Patricia M.

Patricia M. testified that in the early morning hours of January 26, 1988, she was babysitting for a friend who resided in Paramount, when her friend's husband arrived with defendant. The husband went to a bedroom, and Patricia, who had been sleeping on the couch in the living room, thought she heard defendant depart from the residence.

Patricia began to fall back asleep when "this guy [defendant] came over, and all I remember was he was on top of me. . . . I felt something cold on my stomach. And he threatened me by saying that he will shoot me a few times if I will not give him sex. I tried to move, but he stuck the gun at my head and he threatened me, you know, not to scream or not to say anything. And he put it back on my stomach. All I kept thinking was, my children, I have to be there for my children. . . . He went inside of me. He put the gun on the side of the couch, and he started having intercourse with me against my will. I tried not to think of anything but my children and my life, because he threaten[ed] it. I tried to reach for the gun, and I was thinking I could kill him. But I couldn't reach the gun. It was underneath the couch and it kept sliding away. When he was done, he took off real fast . . . ; and I ran to the bathroom to urinate so I wouldn't get pregnant. I took a shower angrily

because I feel dirty. I felt I was real[ly] violated. I thought that I would get even someday, because it was not right what he did to me. . . . I am still afraid. I am still afraid because he is still alive. He is still there. He can do something to me still, or my family."

B. *The Defense Case*

The defense evidence in mitigation was introduced through the testimony of five of defendant's relatives, each of whom described the deprivation and abuse defendant suffered as a child in rural Mexico. The witnesses testified that defendant's childhood was marred by extreme cruelty, vicious beatings, grinding poverty, forced labor, and a lack of care, education, affection, or encouragement by the adults in defendant's life.

Cecilia Manriquez Solis, defendant's first cousin, testified that she and defendant resided as children on a ranch they shared with her grandmother and defendant's father, in Mexico. The area in which the ranch was located lacked electricity, a school, church, store, or regular law enforcement, and none of the residences on the ranch had windows or doors. The children worked from 3:00 a.m. to approximately 5:00 p.m.—farming, planting, and collecting firewood and water, every day of the year except Good Friday. During the few years that Solis and defendant resided together at the ranch, she observed him beaten several times, "sometimes two to three times per day." These beatings included one occasion when defendant was seven years of age: he was tied to a tree and beaten with a whip, and Solis recalled that "my grandmother got tired of hitting him, so my uncle, his father continued to hit him." On other occasions defendant was beaten with a whip or a belt. Such beatings occurred on a daily basis. Once defendant was hog-tied and left all night in a storage bin for corn. Solis never saw defendant receive any sign of love or affection from his grandmother or his father.

Cresencia Tamayo, defendant's aunt, also resided at the ranch when defendant was a young child, and testified that defendant's chores also involved retrieving the "cattle, beasts, burros . . . ." Defendant was sent on errands, and if he failed to perform he "would be hit or beaten" by his father, uncles, or grandmother, several times "all over with the belt" or with a rod or stick. Defendant and the other children worked each day of the year and never were allowed to play except "for a little while" on Good Friday. "There were no toys, [and] [t]here was no Christmas." Rarely was any sort of affection shown to defendant.

Joaquina Ward, who described herself as a half sister to defendant's cousin Cecilia Manriquez Solis, testified that she also resided at the ranch for a few months when defendant was a child. She recalled that the children "were

treated poorly" and that "[w]hen they didn't do what they were told to do, they were hit," defendant more often than the other children. On one occasion, Ward encountered defendant "tied by the legs and the hands," because "he had been sent up to the hills to retrieve some firewood; and because he did not bring the kind that his father had asked for, he was punished." Ward untied defendant, after which "he went down and turned into a little ball, and he stayed there crying." She never saw anyone act affectionately toward defendant.

Juan Manriquez, defendant's cousin, testified that he resided with defendant at the ranch and that the children were prohibited from playing; when they did, they were beaten with "either a rod or a whip." Manriquez recalled that defendant was beaten "for any reason," two or three times per day, "and we could hear his screaming when he was being beaten." On one occasion, defendant was caught bathing with his cousin, which led to another beating while defendant was tied up. When the boys' grandmother caught them eating fruit, she "burned our feet so we couldn't run away and so we wouldn't do it again." Defendant attempted to run away numerous times, which in turn led to his being beaten. Ultimately, defendant was able to run away and find his mother.

Lorenza Sanchez, defendant's half sister, testified that when defendant was approximately 12 or 13 years of age, he came to live with her and their mother at the home where their mother was employed, at which time Sanchez first learned she had a half brother. They resided together for approximately four or five years, during which time they moved to a larger ranch—one that had a school—but defendant did not attend the school, because he spent his time assisting other individuals in harvesting corn. During this period, defendant's mother cohabitated with a man who beat Sanchez and her sister, actions that defendant's mother witnessed, angering defendant who once threw a brick at the man. Sanchez did not recall her mother showing any affection toward defendant.

## III. DISCUSSION

### A. Motion for Severance

Prior to the commencement of trial, defendant moved to sever the case filed against him into "five separate matters," that is, one proceeding for each of the charged murders described above (*ante*, at pp. 553–567) and one proceeding for the Paramount triple murder that the People ultimately introduced as evidence in aggravation at the penalty phase of defendant's trial (*ante*, at pp. 568–569). Defendant contended that the five incidents were factually unrelated and not cross-admissible, and that a joint trial would

engender minimal savings to the judicial system while being severely prejudicial to defendant. Defendant acknowledged that pursuant to section 954, "[t]he charges in the instant case are of the same class of crime and . . . therefore, properly joinable," but asserted that the court had discretion to order separate trials in the interest of justice, and urged the court to do so.[9]

At the hearing on defendant's motion, defendant reiterated the foregoing points, emphasizing that the court had discretion to sever the proceedings, notwithstanding the circumstance that "there is no question they are joinable."[10] In response, the prosecution argued that separate trials would be an inefficient use of judicial resources.[11]

The trial court ordered the three Paramount murders to be severed and tried separately from the other four charged murders, and denied without prejudice defendant's motion for separate trials on each of the four charged murders.[12]

Approximately 14 months later, defendant appeared before the same judge to renew his motion to sever the four charged murders into four separate proceedings, arguing that joinder of the four counts was prejudicial because "[al]though the court is going to instruct . . . the jury that [it] can't use

[9] Section 954 provides in pertinent part: "An accusatory pleading may charge . . . two or more different offenses of the same class of crimes or offenses, under separate counts, . . . provided, that the court in which a case is triable, in the interests of justice and for good cause shown, may in its discretion order that the different offenses or counts set forth in the accusatory pleading be tried separately or divided into two or more groups and each of said groups tried separately."

[10] Defense counsel argued: "The real issue here is [al]though these are cases that are joinable, . . . [whether] the court will exercise [its] discretion . . . to sever these [cases] based on the Penal Code, which says that just because cases are joinable doesn't mean that they have to be joinable. The court needs to look at the case[s] on an individual basis and make a determination whether prejudice has been shown in the case and whether that prejudice rises to that level that outweighs the public policy that we have to join cases. [¶] I tried to show you through my moving papers that there is some degree of prejudice to my client. . . . [¶] . . . [T]hese cases, which are totally separate cases, involve totally separate facts, have not any common thread except my client. . . . [¶] And it's going to be impossible for the jury not to at least have a very strong chance of deciding my client's guilt based on the fact that he is a bad dude, basically, and that is obviously improper. The court knows that, and the court is going to have to instruct the jury that they can't do that."

[11] The prosecutor argued: "If the court were to adopt [the defense] proposal [to sever], . . . what it would amount to is, in the first trial, if the People [obtained a conviction for] first degree murder, then we would have to, in the penalty phase, put on the second, third and fourth murders in addition to the Paramount triple case as aggravating factors. [¶] . . . [¶] We would be having five protracted penalty phase trials if we achieve a first degree murder conviction on each of the four cases, and I think that . . . would just totally obviate the clear purpose [of] judicial economy. . . ."

[12] With regard to the Paramount murders, the trial court granted the prosecution's motion to consolidate those charges filed against defendant with those filed against Paciano Jacques ("Mingo") Ochoa, defendant's half brother.

unrelated evidence of this crime to prove another crime, the problem is I think this jury is going to have much difficulty doing that and they are going to mix these two things together." Defendant further argued that when a prior murder is alleged as a special circumstance, section 190.1, subdivisions (a) and (b), require that the question of defendant's guilt of the charged murder be determined prior to the determination of the truth of the special circumstance alleging a prior murder, in order to avoid the sort of prejudice that defendant would face in one trial for separate, factually unrelated murders. Defendant also hypothesized that if he were tried separately on each of the counts and convicted of first degree murder in the first trial and second degree murder in all subsequent trials, he never would be eligible to face the death penalty, whereas if convicted of one count of first degree murder and three counts of second degree murder in a single trial, he would be eligible for the death penalty; he argued that such dissimilar results violated his right to equal protection of the laws.

The trial court rejected defendant's arguments and denied his motion to sever the trial of the charges.[13]

On appeal, defendant reiterates and expands upon the arguments that were made and rejected in the court below, contending the trial was "fundamentally unfair" because defendant "was forced to defend against the combined weight of the four charged homicides at once." Defendant further contends "[t]he inflammatory impact of a joint trial overwhelmed the jurors' ability to weigh the evidence on each charge, so that they returned first degree murder verdicts on charges with extremely weak evidence." He asserts that he would have fared better had the charges been tried separately, and that the single

---

[13] In denying defendant's motion, the trial court found as follows:

". . . If the court were deciding strictly on the basis of judicial economy, I think your argument is certainly persuasive that the rights of the defendant should outweigh any concerns of the court about conserving the court's time.

"But I think that the answer to the argument is that the Legislature, in setting forth the bifurcation that you cite in the prior conviction of the murder, certainly were able to contemplate that there could be people who were accused of multiple murders and had the [Legislature] wished to refine the death penalty . . . [that] could have been done and it hasn't been done.

"So I think the state of the law is that . . . this is the way that things ought to be tried. And that brings us back, notwithstanding what you said, . . . to the fact that in multiple count cases . . . that the People have a right to set forth their accusatory pleading and to try the defendant on all the matters on which he stands accused.

"And I think that it's a matter that the jury has to be made aware of and that they have to be examined with care on this subject, so that they can follow the law and not, as you say, borrow from one fact situation to the other or to be inflamed against the defendant because of the multiplicity of the alleged crimes.

"But I think that you have to assume that jurors are going to follow the law. They will be properly instructed.

"So the motion to sever the individual counts is again denied."

trial violated his rights to due process of law and a fair and reliable determination as to guilt and punishment.[14]

■ "The law prefers consolidation of charges. (*People v. Ochoa* (1998) 19 Cal.4th 353, 409 [79 Cal.Rptr.2d 408, 966 P.2d 442].) Where, as here, the offenses charged are of the same class, joinder is proper under section 954. (*People v. Kraft* (2000) 23 Cal.4th 978, 1030 [99 Cal.Rptr.2d 1, 5 P.3d 68] (*Kraft*); *People v. Bradford* (1997) 15 Cal.4th 1229, 1315 [65 Cal.Rptr.2d 145, 939 P.2d 259] (*Bradford*).) Defendant can predicate error in the denial of the motion only on a clear showing of potential prejudice. (*Kraft*, at p. 1030; *Bradford*, at p. 1315.) We review the denial of defendant's motion for an abuse of discretion, that is, whether the denial fell ' "outside the bounds of reason." ' (*Ochoa*, at p. 408, quoting *People v. DeSantis* (1992) 2 Cal.4th 1198, 1226 [9 Cal.Rptr.2d 628, 831 P.2d 1210].)" (*People v. Ochoa* (2001) 26 Cal.4th 398, 423 [110 Cal.Rptr.2d 324, 28 P.3d 78] (*Ochoa II*).)

As we further explained in *Ochoa II*, "We have developed criteria to guide evaluations of trial court decisions on severance motions. ' " 'Refusal to sever may be an abuse of discretion where: (1) evidence on the crimes to be jointly tried would not be cross-admissible in separate trials; (2) certain of the charges are unusually likely to inflame the jury against the defendant; (3) a "weak" case has been joined with a "strong" case, or with another "weak" case, so that the "spillover" effect of aggregate evidence on several charges might well alter the outcome of some or all of the charges; and (4) any one of the charges carries the death penalty or joinder of them turns the matter into a capital case.' " ' (*Kraft*, *supra*, 23 Cal.4th at p. 1030.) [¶] Cross-admissibility of evidence is sufficient but not necessary to deny severance. (*Bradford*, *supra*, 15 Cal.4th at p. 1316.) As the four-part test is stated in the conjunctive, joinder may be appropriate even though the evidence is not cross-admissible and only one of the charges would be capital absent joinder. (*People v. Musselwhite* (1998) 17 Cal.4th 1216, 1244–1246 [74 Cal.Rptr.2d 212, 954 P.2d 475] (*Musselwhite*).) Even where the People present capital charges, joinder is proper so long as evidence of each charge is so strong that consolidation is unlikely to affect the verdict. (*People v. Arias* (1996) 13 Cal.4th 92, 130, fn. 11 [51 Cal.Rptr.2d 770, 913 P.2d 980] (*Arias*); *People v.*

---

[14] As we have noted elsewhere: " 'With regard both to this claim and to every other claim raised in his brief, defendant asserts that each alleged error violates not only state law but multiple provisions of the federal and California Constitutions. In addressing each claim discussed in this opinion, we have considered defendant's contention that the alleged error violates the federal and California Constitutions, and our rejection of each claim of reversible error includes a determination that the alleged error does not warrant reversal under the state or federal Constitution.' " (*People v. Carter* (2005) 36 Cal.4th 1215, 1237–1238, fn. 14 [32 Cal.Rptr.3d 838, 117 P.3d 544]; see *People v. Slaughter* (2002) 27 Cal.4th 1187, 1199, fn. 2 [120 Cal.Rptr.2d 477, 47 P.3d 262].)

*Lucky* (1988) 45 Cal.3d 259, 277–278 [247 Cal.Rptr. 1, 753 P.2d 1052] (*Lucky*).)" (*Ochoa II, supra,* 26 Cal.4th 398, 423.)

█ In the present case, the trial court correctly recognized the law's preference for joinder and properly exercised its discretion in denying the severance motion. (See *ante,* at p. 573, fn. 13; *Ochoa II, supra,* 26 Cal.4th at p. 423.) Although defendant contends the trial court believed it had no discretion, that position is belied by the passages from the hearings noted above. Defendant's position is further belied by the circumstance that, because the judge who granted defendant's motion to sever the Paramount triple murders from the four murders for which defendant was tried and convicted was the same judge who denied defendant's motion to sever the four charged murders into separate proceedings, the judge clearly understood that he had discretion to sever.

With regard to defendant's alternate contention that the trial court abused its discretion, we observe that although the prosecution did not make a showing of cross-admissibility in support of joinder, the absence of such a showing did not require severance. (*Ochoa II, supra,* 26 Cal.4th 398, 423.)

In view of the circumstance that each of the four homicides involved a charge that defendant, armed with a concealed and loaded firearm, initiated a fatal attack upon an unarmed individual, no particular killing was "significantly more egregious" than any other (contrary to defendant's assertion otherwise), and therefore none were "unusually likely to inflame the jury against the defendant." The suggestion that defendant also was linked to the cocaine recovered from the Las Playas and Rita Motel crime scenes was hardly inflammatory relative to the homicides charged against him. Thus, a "weak" case was not joined to a "strong" one.

Although none of the individual homicides carried a special circumstance that might have converted the matter into a capital case, and joinder did effect such conversion (in view of the multiple-murder special circumstance), we conclude that as a practical matter joinder had a minimal effect, because the evidence as to each homicide indicated that defendant intentionally killed with premeditation and deliberation, providing a compelling basis for four convictions of first degree murder and a true finding as to multiple murder even if defendant had been tried separately for each homicide. Defendant's speculative and unconvincing contentions to the contrary—that had he been tried individually, he "probably" would have been acquitted of the murder of George Martinez at the Fort Knots bar and "probably" would have been

convicted of only second degree murder in the killing of Efrem Baldia at the Rita Motel—never were presented to the trial court at the time of his motion to sever. Moreover, separate trials would have given the prosecution multiple opportunities in which to convince a jury to impose the death penalty upon defendant. (See *People v. Carter* (2005) 36 Cal.4th 1114, 1158, fn. 17 [32 Cal.Rptr.3d 759, 117 P.3d 476].) No abuse of discretion or abridgment of defendant's right to due process of law appears. (*People v. Box* (2000) 23 Cal.4th 1153, 1195–1197 [99 Cal.Rptr.2d 69, 5 P.3d 130].)

In sum, defendant fails to establish that he made "a clear showing of potential prejudice," and our review of the trial court's denial of defendant's severance motion indicates that it was not " ' "outside the bounds of reason." ' " (*Ochoa II, supra,* 26 Cal.4th at p. 423; see also *People v. Catlin* (2001) 26 Cal.4th 81, 110–113 [109 Cal.Rptr.2d 31, 26 P.3d 357] [upholding trial court's denial of the defendant's motion to sever one murder count from a second murder count].)

Even if we were to assume for the sake of discussion that the trial court erred in denying defendant's motion to sever, the evidence linking defendant to each homicide was strong, and none was potentially inflammatory vis-à-vis the other; accordingly, any error would have been harmless, because it is not reasonably probable that defendant would have received a more favorable result as to any count even had he been tried separately as to each one. (See *People v. Pinholster* (1992) 1 Cal.4th 865, 931–932 [4 Cal.Rptr.2d 765, 824 P.2d 571].) Accordingly, we reject defendant's claims of prejudicial error.

### B. *Sufficiency of the Evidence*

Defendant contends that "there was little or no evidence" that any of the charged homicides were premeditated or deliberate, and that the evidence therefore was insufficient to sustain his convictions of the first degree murder of Miguel Garcia, George Martinez, Efrem Baldia, and Jose Gutierrez. As we explain below, defendant's position is completely without merit.

In considering defendant's claim, "we must 'review the entire record, and drawing all reasonable inferences in favor of [the judgment], . . . determine whether a rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' ([*People v. ]Raley* [(1992)] 2 Cal.4th 870, 889 [8 Cal.Rptr.2d 678, 830 P.2d 712].)" (*People v. Hughes* (2002) 27 Cal.4th 287, 370 [116 Cal.Rptr.2d 401, 39 P.3d 432] (*Hughes*).)

■ " 'Reversal on this ground is unwarranted unless it appears "that upon no hypothesis whatever is there sufficient substantial evidence to support [the conviction]." [Citation.] In *People v. Anderson* [(1968)] 70 Cal.2d [15,] 26–27 [73 Cal.Rptr. 550, 447 P.2d 942], we identified three categories of evidence relevant to resolving the issue of premeditation and deliberation: planning activity, motive, and manner of killing. However, as later explained in *People v. Pride* (1992) 3 Cal.4th 195, 247 [10 Cal.Rptr.2d 636, 833 P.2d 643]: "*Anderson* does not require that these factors be present in some special combination or that they be accorded a particular weight, nor is the list exhaustive. *Anderson* was simply intended to guide an appellate court's assessment whether the evidence supports an inference that the killing occurred as the result of preexisting reflection rather than unconsidered or rash impulse. [Citation.]" Thus, while premeditation and deliberation must result from " 'careful thought and weighing of considerations' " (70 Cal.2d at p. 27), we continue to apply the principle that "[t]he process of premeditation and deliberation does not require any extended period of time. 'The true test is not the duration of time as much as it is the extent of the reflection. Thoughts may follow each other with great rapidity and cold, calculated judgment may be arrived at quickly . . . .' [Citations.]" ' (*People v. Bolin* (1998) 18 Cal.4th 297, 331–332 [75 Cal.Rptr.2d 412, 956 P.2d 374].)" (*Hughes, supra,* 27 Cal.4th 287, 370–371.)

In the present case, there is ample evidence supporting the inference that each of the killings " ' "occurred as the result of preexisting reflection rather than unconsidered or rash impulse." ' " (*Hughes, supra,* 27 Cal.4th 287, 370.)

With regard to the killing of Miguel Garcia at the Las Playas restaurant, the evidence at trial revealed that defendant and the victim were engaged in a verbal altercation; several minutes thereafter elapsed, at which point defendant approached the victim, pulled a firearm from his waistband, cocked the weapon, and fired several shots to the victim's head, neck, and chest areas—conduct that, viewed as a whole, supported the jury's findings of premeditation and deliberation. (See *People v. Koontz* (2002) 27 Cal.4th 1041, 1082 [119 Cal.Rptr.2d 859, 46 P.3d 335] (*Koontz*) [evidence that the defendant fired a shot at a vital area of the victim's body represented "a manner of killing indicative of a deliberate intent to kill"].) By contrast, defendant's version of the events as given to law enforcement officers, in which he claimed to have held the crowd at bay while his friend fired the fatal shots, was not credible in view of the information obtained from other patrons at the restaurant, and because the person defendant identified as the shooter, "Francisco Manzano," was an alias defendant himself had used one month earlier.

The evidence related to the killing of George Martinez at the Fort Knots bar similarly was sufficient to support the jury's finding that defendant acted

with premeditation and deliberation. After defendant forcibly was removed from the bar on repeated occasions, defendant threatened to return with a firearm, did so, and fired two gunshots at close range to the victim's chest. Each of the ensuing two wounds was severe enough to have been fatal. This evidence clearly was sufficient to support a finding of premeditation and deliberation. (See *Koontz, supra,* 27 Cal.4th 1041, 1080–1082 [the defendant, having armed himself with two concealed, loaded handguns, argued with the victim and followed him to a different apartment, resumed the argument, then fired the fatal shot to the victim's abdomen].) Defendant's contention—that "assuming arguendo that [he] was the man who was thrown out of the bar, and returned to shoot Martinez," he nonetheless did not commit first degree murder, because defendant was drunk and had been beaten up and briefly knocked unconscious by the victim—in essence asks this court to reweigh the evidence. The jury was instructed on intoxication and heat of passion and rejected those alternative theories in favor of finding defendant guilty of first degree murder. The evidence was sufficient to support the charge.

The killing of Efrem Baldia at the Rita Motel similarly was shown to have been the result of defendant's premeditation and deliberation. The evidence adduced at trial established that defendant, armed with a concealed firearm, left his room at the motel, angrily confronted the victim, and fired several times, inflicting multiple wounds to the victim's chest. The evidence plainly was sufficient. (See *People v. Steele* (2002) 27 Cal.4th 1230, 1250 [120 Cal.Rptr.2d 432, 47 P.3d 225] ["As to planning, the jury could infer that defendant carried the fatal knife into the victim's home in his pocket, which makes it 'reasonable to infer that he considered the possibility of homicide from the outset.' "].) Defendant's contention, that he armed himself because Baldia "normally carried a gun" and was romantically involved with defendant's girlfriend, Sylvia Tinoco (and therefore defendant "reasonably feared that Baldia might shoot him"), again invites this court to reweigh the substantial evidence in support of the jury's determination that defendant acted with premeditation and deliberation. We decline to do so. The evidence was sufficient.

Finally, with regard to the killing of Jose Gutierrez, the evidence adduced at trial revealed that defendant, having armed himself with a loaded firearm, approached the victim, who was asleep at the bar, grabbed him and shot him repeatedly in the back from very close range, causing multiple fatal gunshot wounds. The evidence was sufficient to establish premeditation and deliberation. (*Koontz, supra,* 27 Cal.4th 1041, 1082.) In view of this evidence, the jury was entitled to discredit the alternate version of events provided by defendant's friend, Beatriz Escamilla, who testified that defendant shot the victim in response to provocation by the victim. We shall not substitute the jury's implied findings with an alternate version, preferred by defendant, that the jury considered and rejected.

In sum, as to each one of the four charged killings, we believe it is clear that " 'a rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " (*Hughes, supra,* 27 Cal.4th 287, 370.) We therefore reject defendant's contention that substantial evidence did not support the jury's findings that defendant acted with premeditation and deliberation in fatally shooting Miguel Garcia, George Martinez, Efrem Baldia, and Jose Gutierrez.

## C. *Jury Instruction Issues*

### 1. *CALJIC No. 17.02—Several Counts*

Defendant contends the trial court erred in refusing to instruct the jury with a proposed instruction that read as follows: "The defendant is charged in the Information with four separate counts of murder. There is no evidence that has been presented on one count that can be considered by you as proof of any of the other counts. You are instructed to deliberate on each count separately, as though it were the only count for you to decide. The joining together of the four counts in this case cannot be considered by you in any way that it is more likely the defendant is guilty of any of the counts."

In refusing to give defendant's proposed instruction, the trial court observed: "The court feels that [the proposed instruction is] covered by CALJIC No. 17.02, which in turn has been modified by the court." The modified pattern instruction given to the jury read as follows: "Each count charges a distinct crime. You must decide each count separately as though it were the only count for you to decide. Your finding as to each count must be stated in a separate verdict. When one count is decided, you must turn your attention to the next count without regard for the decision that you have reached in the previous counts."

Defendant contends that in the absence of the instruction he requested, "the jurors almost certainly assumed that they could consider the evidence of the charged offenses jointly, and could find [defendant] guilty of first degree murder on any or all of the counts based on his supposed propensity to commit murder, as demonstrated by the combined evidence of all the charges."

We are unpersuaded. The focus of defendant's concern—that the jury improperly might base one or more of its verdicts on his "supposed propensity to commit murder" and that "the jurors almost certainly assumed that

they could consider the evidence of the charged offenses jointly"—was addressed adequately in the modified version of CALJIC No. 17.02 with which the court instructed the jury. The court's instruction made clear that the jurors were to consider each of the charged murders as a "distinct" crime that needed to be considered "separately" and set forth in a "separate verdict." The instruction further directed the jury to deal with the charges seriatim, "without regard for the decision that you have reached in previous counts." The modified version of CALJIC No. 17.02 adequately directed the jury to consider each crime separately, and the court properly rejected defendant's proffered instruction as duplicative. (See *People v. Catlin, supra,* 26 Cal.4th 81, 109 [upholding the trial court's refusal to give a special instruction that was duplicative of CALJIC No. 17.02].) No instructional error appears.[15]

Further, in view of the instruction actually given, there is no reasonable likelihood that the alternative instruction proffered by defendant, had it been given, would have altered the result in this case.[16]

### 2. CALJIC No. 5.17—Imperfect Self-defense (Efrem Baldia, Rita Motel)

As to each one of the charged murders, except for that pertaining to the killing at the Mazatlan Bar (discussed *post*), the trial court instructed the jury on the lesser included offense of voluntary manslaughter based upon the alternate theories of sudden quarrel or heat of passion. Defendant contends that the trial court erred in refusing his request that the jury also be instructed on imperfect self-defense with regard to the killing of Efrem Baldia in the Rita Motel parking lot. (See CALJIC No. 5.17.)[17] As we explain, defendant's contention is without merit.

---

[15] As we have noted in the text, defendant's proposed instruction would have informed the jury that "[t]here is no evidence that has been presented on one count that can be considered by you as proof of any other counts." The proposed instruction would have been potentially confusing for the jury, which for example was confronted with the testimony of Beatriz Escamilla, who was a witness to the murder of Efrem Baldia at the Rita Motel, and to the murder of Jose Gutierrez at the Mazatlan Bar; the jury thus was faced with the need to evaluate her credibility generally as to multiple counts.

[16] Insofar as defendant contends the trial court's asserted error in refusing his proffered instruction was exacerbated by the prosecutor's closing arguments, which described defendant's mindset as well as certain general similarities between the charged crimes, we reject the point; the prosecutor's remarks fairly commented upon, and drew reasonable inferences from, the evidence adduced at trial.

[17] CALJIC No. 5.17, as requested by defendant, provided: "A person, who kills another person in the honest but unreasonable belief in the necessity to defend against imminent peril to life or great bodily injury, kills unlawfully, but does not harbor malice aforethought and is not guilty of murder. This would be so even though a reasonable person in the same situation seeing and knowing the same facts would not have had the same belief. Such an honest but unreasonable belief is not a defense to the crime of voluntary or involuntary manslaughter."

" 'Under the doctrine of imperfect self-defense, when the trier of fact finds that a defendant killed another person because the defendant *actually*, but unreasonably, believed he was in imminent danger of death or great bodily injury, the defendant is deemed to have acted without malice and thus can be convicted of no crime greater than voluntary manslaughter.' (*In re Christian S.* (1994) 7 Cal.4th 768, 771 [30 Cal.Rptr.2d 33, 872 P.2d 574].) As we explained in *People v. Barton* (1995) 12 Cal.4th 186, 200–201 [47 Cal.Rptr.2d 569, 906 P.2d 531], imperfect self-defense is not an affirmative defense, but a description of one type of voluntary manslaughter. Thus the trial court must instruct on this doctrine, whether or not instructions are requested by counsel, whenever there is evidence substantial enough to merit consideration by the jury that under this doctrine the defendant is guilty of voluntary manslaughter. (*Id.* at pp. 194, 201.) If it were a true affirmative defense, however, an instruction would be required only if it appears that the defendant was relying on the defense, or that there was substantial evidence supportive of the defense, and the defense was not inconsistent with the defendant's theory of the case. (*Id.* at p. 195; see *People v. Sedeno* (1974) 10 Cal.3d 703, 716 [112 Cal.Rptr. 1, 518 P.2d 913].)" (*People v. Michaels* (2002) 28 Cal.4th 486, 529 [122 Cal.Rptr.2d 285, 49 P.3d 1032].)

"[T]he doctrine is narrow. It requires without exception that the defendant must have had an *actual* belief in the need for self-defense. We also emphasize what should be obvious. Fear of future harm—no matter how great the fear and no matter how great the likelihood of the harm—will not suffice. The defendant's fear must be of *imminent* danger to life or great bodily injury. ' "[T]he peril must appear to the defendant as immediate and present and not prospective or even in the near future. *An imminent peril is one that, from appearances, must be instantly dealt with.*" . . .' [¶] . . . [W]e reiterate that, just as with perfect self-defense or any defense, '[a] trial court need give a requested instruction concerning a defense *only if there is substantial evidence to support the defense.*' (*People v. Aris* [(1989)] 215 Cal.App.3d [1178,] 1192 [264 Cal.Rptr. 167], italics added.)" (*In re Christian S.*, *supra*, 7 Cal.4th at p. 783; see also *People v. Wright* (2005) 35 Cal.4th 964, 974 [28 Cal.Rptr.3d 708, 111 P.3d 973].)

On appeal, we apply a de novo standard of review. (*People v. Waidla* (2000) 22 Cal.4th 690, 733 [94 Cal.Rptr.2d 396, 996 P.2d 46] (*Waidla*).) In so doing, we examine a record in the present case that is devoid of evidence suggesting that when defendant left his room at the Rita Motel to confront Efrem Baldia, he harbored an actual belief in the need for self-defense against an imminent danger to life or great bodily injury. To the contrary, defendant's statements to the investigating officers indicated he wanted to tell Baldia that

Baldia "could have" Sylvia Tinoco because defendant intended to return to Mexico. Although defendant also informed the officers that "he had heard some threats" that Baldia wanted to kill him, defendant made no claim of ever having seen Baldia armed with any weapon, said nothing about believing Baldia was armed, and never indicated he felt he was under any imminent threat of death or great bodily injury when he drew the firearm from his waistband.

Ramiro Salazar, who accompanied the victim to the Rita Motel immediately prior to the shooting, testified that defendant appeared angry as he emerged from the room, that Baldia was unarmed, and that the vehicle in which Salazar and Baldia arrived did not contain a weapon. Salazar further testified that Baldia asked defendant, "Why are you mad at me?," after which defendant let Baldia go and Baldia backed up, asking defendant, "What's your problem with me?" Salazar's testimony contained nothing to indicate defendant feared the victim. Although Salazar testified that Baldia usually carried a gun, the record contains no evidence that defendant possessed a similar knowledge or belief.

In view of the foregoing testimony, which at most revealed that defendant may have harbored some fear of future harm but provided no indication that defendant "*actually*, but unreasonably, believed he was in imminent danger of death or great bodily injury" (*In re Christian S., supra,* 7 Cal.4th 768, 771), the evidence clearly was insufficient to require the giving of defendant's requested instruction regarding imperfect self-defense. (See *People v. Seaton* (2001) 26 Cal.4th 598, 664 [110 Cal.Rptr.2d 441, 28 P.3d 175] [when the defendant's own testimony showed him to be the initial aggressor, and the victim's response to be legally justified, the defendant could not rely on unreasonable self-defense as a ground for voluntary manslaughter instructions].) We therefore conclude the trial court correctly refused to instruct the jury on imperfect self-defense.

■ The jury's verdict finding defendant guilty of the first degree murder of Efrem Baldia implicitly rejected defendant's version of the events, leaving no doubt the jury would have returned the same verdict had it been instructed regarding imperfect self-defense. (See *People v. Lewis* (2001) 25 Cal.4th 610, 646 [106 Cal.Rptr.2d 629, 22 P.3d 392] ["Error in failing to instruct the jury on a lesser included offense is harmless when the jury necessarily decides the factual questions posed by the omitted instructions adversely to defendant under other properly given instructions."].) Accordingly, even if we were to assume the failure to instruct on imperfect self-defense violated defendant's constitutional rights, we would find the error harmless. (See *People v. Sakarias* (2000) 22 Cal.4th 596, 621 [94 Cal.Rptr.2d 17, 995 P.2d 152] [no state or federal constitutional error occurs requiring reversal for failure to

instruct the jury regarding a lesser included offense, when the evidence in support of that offense "was, at best, extremely weak"].)

### 3. *Voluntary Manslaughter (Jose Gutierrez, Mazatlan Bar)*

As noted above, the trial court instructed the jury on the lesser included offense of voluntary manslaughter based upon a sudden quarrel or heat of passion, as to each one of the charged killings except the killing of Jose Gutierrez committed at the Mazatlan Bar. Defendant contends the trial court's refusal to instruct on voluntary manslaughter regarding the Gutierrez killing constituted reversible error. He is mistaken.

■ "The Penal Code defines manslaughter as 'the unlawful killing of a human being without malice.' (§ 192.) The offense is voluntary manslaughter when the killing is 'upon a sudden quarrel or heat of passion.' (*Id.*, subd. (a).) As we have explained in greater detail in *People v. Breverman* (1998) 19 Cal.4th 142, 154 [77 Cal.Rptr.2d 870, 960 P.2d 1094] (*Breverman*), manslaughter has been considered a lesser, necessarily included, offense of intentional murder. Generally, an intent to unlawfully kill reflects malice. (§ 188; *Breverman, supra,* 19 Cal.4th at p. 153; *People v. Saille* [(1991)] 54 Cal.3d [1103,] 1113 [2 Cal.Rptr.2d 364, 820 P.2d 588].) An unlawful killing with malice is murder. (§ 187.) Nonetheless, an intentional killing is reduced to voluntary manslaughter if other evidence negates malice. Malice is presumptively absent when the defendant acts upon a sudden quarrel or heat of passion on sufficient provocation (§ 192, subd. (a)), or kills in the unreasonable, but good faith, belief that deadly force is necessary in self-defense. (*In re Christian S.*[, *supra,*] 7 Cal.4th 768 [30 Cal.Rptr.2d 33, 872 P.2d 574].) Only these circumstances negate malice when a defendant intends to kill. (*People v. Barton*[, *supra,*] 12 Cal.4th 186, 199 [47 Cal.Rptr.2d 569, 906 P.2d 531].)" (*People v. Lee* (1999) 20 Cal.4th 47, 58–59 [82 Cal.Rptr.2d 625, 971 P.2d 1001] (*Lee*).)

As we further explained in *Lee*: "Although section 192, subdivision (a), refers to 'sudden quarrel or heat of passion,' the factor which distinguishes the 'heat of passion' form of voluntary manslaughter from murder is provocation. The provocation which incites the defendant to homicidal conduct in the heat of passion must be caused by the victim (see *In re Thomas C.* (1986) 183 Cal.App.3d 786, 798 [228 Cal.Rptr. 430]), or be conduct reasonably believed by the defendant to have been engaged in by the victim. (See *People v. Brooks* (1986) 185 Cal.App.3d 687, 694 [230 Cal.Rptr. 86]; see also 1 Witkin & Epstein, Cal. Criminal Law (2d ed. 1988) Crimes Against the Person, § 512, p. 579.) The provocative conduct by the victim may be physical or verbal, but the conduct must be sufficiently provocative that it would cause an ordinary person of average disposition to act rashly or

without due deliberation and reflection. (*People v. Berry* (1976) 18 Cal.3d 509, 515 [134 Cal.Rptr. 415, 556 P.2d 777]; *People v. Valentine* (1946) 28 Cal.2d 121, 138–139 [169 P.2d 1].) 'Heat of passion arises when "at the time of the killing, the reason of the accused was obscured or disturbed by passion to such an extent as would cause the ordinarily reasonable person of average disposition to act rashly and without deliberation and reflection, and from such passion rather than from judgment." ' (*People v. Barton, supra,* 12 Cal.4th at p. 201.)" (*Lee, supra,* 20 Cal.4th 47, 59.)

Thus, "[t]he heat of passion requirement for manslaughter has both an objective and a subjective component. (*People v. Wickersham* (1982) 32 Cal.3d 307, 326–327 [185 Cal.Rptr. 436, 650 P.2d 311].) The defendant must actually, subjectively, kill under the heat of passion. (*Id.* at p. 327.) But the circumstances giving rise to the heat of passion are also viewed objectively. As we explained long ago in interpreting the same language of section 192, 'this heat of passion must be such a passion as would naturally be aroused in the mind of an ordinarily reasonable person under the given facts and circumstances,' because 'no defendant may set up his own standard of conduct and justify or excuse himself because in fact his passions were aroused, unless further the jury believe that the facts and circumstances were sufficient to arouse the passions of the ordinarily reasonable man.' (*People v. Logan* (1917) 175 Cal. 45, 49 [164 P. 1121].)" (*People v. Steele, supra,* 27 Cal.4th 1230, 1252–1253; see also *People v. Gutierrez* (2002) 28 Cal.4th 1083, 1143–1144 [124 Cal.Rptr.2d 373, 52 P.3d 572] [same].)

" 'To satisfy the objective or "reasonable person" element of this form of voluntary manslaughter, the accused's heat of passion must be due to "sufficient provocation." ' (*People v. Wickersham, supra,* 32 Cal.3d at p. 326.)" (*People v. Gutierrez, supra,* 28 Cal.4th 1083, 1144.)

■ A trial court must instruct on a lesser included offense if substantial evidence exists indicating that the defendant is guilty only of the lesser offense. (*People v. Breverman, supra,* 19 Cal.4th 142, 162.) " 'Substantial evidence' in this context is ' "evidence from which a jury composed of reasonable [persons] could . . . conclude[]" ' that the lesser offense, but not the greater, was committed. [Citations.]" (*Ibid.*)

As noted earlier, on appeal we employ a de novo standard of review and independently determine whether an instruction on the lesser included offense of voluntary manslaughter should have been given. (See *Waidla, supra,* 22 Cal.4th 690, 733.)

In the present case, the evidence adduced at trial presented two mutually exclusive descriptions of the circumstances surrounding the killing of Jose

Gutierrez, as follows. Adela Lopez, who worked at the Mazatlan Bar on the night of the shooting, testified that immediately prior to the events in question, the victim was asleep at the bar, and that defendant grabbed him without exchanging any words and thereafter repeatedly shot him. Immediately after the shooting, Lopez observed defendant depart from the bar "with a pistol in his hand," followed by the bar's security guards with their weapons drawn. By contrast, Beatriz Escamilla testified that the victim approached defendant and "started offending him," called defendant "a mother fucker," asking defendant whether he had a gun and daring him to use it. According to Escamilla, defendant repeatedly told the victim to calm down and that he did not want any problems. Escamilla testified that she did not see the victim attempt to grab or stab defendant or hold a weapon, nor did she see one fall to the ground. She testified that defendant shot him from a distance of approximately four feet.

"In deciding whether there is substantial evidence of a lesser offense, courts should not evaluate the credibility of witnesses, a task for the jury." (*People v. Breverman, supra,* 19 Cal.4th 142, 162.) Thus, we need not and do not attempt to determine whether the testimony given by Adela Lopez or Beatriz Escamilla was the more credible. Such a determination is not pertinent, because even under the version of events that was ostensibly more favorable to defendant, Escamilla testified that defendant repeatedly told the victim to calm down and that defendant did not want any problems. Escamilla's testimony contained no indication that defendant's actions reflected any sign of heat of passion at the time he commenced firing his handgun at the victim. There was no showing that defendant exhibited anger, fury, or rage; thus, there was no evidence that defendant "actually, subjectively, kill[ed] under the heat of passion." (*People v. Steele, supra,* 27 Cal.4th 1230, 1252.) To the contrary, Escamilla's testimony portrayed defendant as attempting to exert a calming influence on the victim. The subjective element of the heat of passion theory clearly was not satisfied, and for that reason the trial court did not err in refusing to instruct the jury as to heat of passion with regard to the killing of Jose Gutierrez. (See *People v. Johnson* (1993) 6 Cal.4th 1, 43–44 [23 Cal.Rptr.2d 593, 859 P.2d 673] [rejecting the defendant's contention that the trial court erred in failing to instruct on provocation when the evidence adduced at trial did not indicate whether the victim's statements and conduct had any effect on the defendant's state of mind].)

Even if we were to assume for the sake of discussion that Escamilla's testimony satisfied the subjective requirement that defendant actually killed Gutierrez in the heat of passion, however, the evidence of provocation was insufficient to satisfy the objective requirement, that is, that defendant's heat of passion resulted from sufficient provocation caused by the victim. Although the provocative conduct may be verbal, as it may have been if Escamilla's testimony were to be credited, such provocation "must be such

that an average, sober person would be so inflamed that he or she would lose reason and judgment." (*Lee, supra,* 20 Cal.4th 47, 60.) That standard was not met here. Escamilla testified that Gutierrez called defendant a "mother fucker" and that he also taunted defendant, repeatedly asserting that if defendant had a weapon, he should take it out and use it. Such declarations, as recounted by Escamilla, comprised the only evidence of provocative conduct attributed to the victim, and plainly were insufficient to cause an average person to become so inflamed as to lose reason and judgment. (*Ibid.*) Accordingly, the evidence of provocation was insufficient to suggest that defendant's killing of Gutierrez amounted to voluntary manslaughter rather than murder. The trial court properly denied defendant's request for an instruction on voluntary manslaughter based upon the theory of a sudden quarrel or heat of passion.

Finally, we observe that as to each of the four counts of murder charged against defendant, the trial court instructed the jury that evidence of provocation could be considered in determining the degree of the murder. (CALJIC No. 8.73.)[18] The court also gave other pattern instructions informing the jurors that if they harbored a reasonable doubt as to whether defendant committed first degree or second degree murder, or harbored a reasonable doubt as to whether the killing was murder or manslaughter, they must give defendant the benefit of the doubt and return a verdict of guilty of the lesser offense. (CALJIC Nos. 8.71, 8.72.) In view of these instructions, and considering the factual determinations made by the jury in reaching a verdict of first degree murder, we conclude the jury would have returned the same verdict of first degree murder as to the killing of Jose Gutierrez even if the voluntary manslaughter instruction refused by the trial court had been given. Accordingly, even if we were to assume for the sake of discussion that the trial court erred in refusing the instruction requested by defendant, any error clearly would have been harmless. (See *People v. Gutierrez, supra,* 28 Cal.4th 1083, 1144–1145.)

### 4. *Involuntary Manslaughter (Efrem Baldia, Rita Motel)*

Defendant contends the trial court erred when if failed to instruct the jury on its own motion that involuntary manslaughter was a lesser included offense of the charged murder of Efrem Baldia at the Rita Motel. We disagree.

---

[18] The trial court instructed the jury as follows: "If the evidence establishes [that] there was provocation which played a part in inducing an unlawful killing of a human being, but the provocation was not sufficient to reduce the homicide to manslaughter, you should consider the provocation for such bearing as it may have on whether the defendant killed with or without deliberation and premeditation." (CALJIC No. 8.73 (1992 rev.).)

"Manslaughter is deemed to be related to murder as a lesser included offense. (See, e.g., 1 Witkin & Epstein, Cal. Criminal Law (2d ed. 1988) Defenses, § 327, p. 379; compare Pen. Code, § 187, subd. (a) [defining murder as the 'unlawful killing of a human being . . . with malice aforethought'] with *id.*, § 192 [defining manslaughter as the 'unlawful killing of a human being without malice'].) As relevant here, manslaughter is voluntary, i.e., 'upon a sudden quarrel or heat of passion' (*id.*, § 192, subd. (a)), or involuntary, i.e., 'in the commission of an unlawful act, not amounting to felony; or in the commission of a lawful act which might produce death, in an unlawful manner, or without due caution and circumspection' (*id.*, § 192, subd. (b))." (*People v. Berryman* (1993) 6 Cal.4th 1048, 1080 [25 Cal.Rptr.2d 867, 864 P.2d 40].)

In the present case, the trial court instructed the jury on murder and, as noted earlier, it also instructed on voluntary manslaughter as a lesser included offense as to the killings committed at the Las Playas restaurant, Fort Knots bar, and the Rita Motel. The court did not instruct on involuntary manslaughter as a lesser included offense with regard to any of the charged murders, and defendant did not ask it to do so.

In support of his contention that the trial court should have instructed on its own motion on involuntary manslaughter as a lesser included offense of the murder of Efrem Baldia at the Rita Motel, defendant relies upon two items of evidence adduced at the trial: his own statement to investigating officers that, upon drawing his firearm from his waistband and placing the barrel against the victim's stomach, he pushed Baldia backward as the weapon discharged, and the testimony of Dr. Rogers that two of Baldia's five gunshot wounds were fatal, one to the lower left back and the other to the right side of the chest. Defendant posits that the latter wound was the only one "that could have been inflicted in the manner [defendant had] described" to the investigating officers. In light of this evidence, defendant asserts that "a reasonable juror could have concluded that [defendant] shot Baldia by mistake, while negligently attempting to defend against a perceived threat[, a] finding that would have supported a conviction for involuntary manslaughter, not premeditated murder."

As also noted earlier, we independently determine whether an instruction on the lesser included offense of involuntary manslaughter should have been given. (See *Waidla, supra,* 22 Cal.4th 690, 733.)

There was no error. "A court is not obligated to instruct sua sponte on involuntary manslaughter as a lesser included offense unless there is substantial evidence, i.e., evidence from which a rational trier of fact could find beyond a reasonable doubt (see *People v. Wickersham* (1982) 32 Cal.3d 307,

325 [185 Cal.Rptr. 436, 650 P.2d 311]) that the defendant killed his victim 'in the commission of an unlawful act, not amounting to felony; or in the commission of a lawful act which might produce death, in an unlawful manner, or without due caution and circumspection' (Pen. Code, § 192, subd. (b))." (*People v. Berryman, supra,* 6 Cal.4th 1048, 1081; see also *People v. Breverman, supra,* 19 Cal.4th 142, 162 [" 'Substantial evidence' in this context is ' "evidence from which a jury composed of reasonable [persons] could . . . conclude[]" ' that the lesser offense, but not the greater, was committed"].)

There was no such evidence here. The killing of Efrem Baldia can only be characterized as having been intentional. The victim suffered two fatal and three nonfatal gunshot wounds inflicted at close range. Even if we were to accept defendant's statement, made during his hospital interview with Detective Olmedo, that the first shot simply "discharged" when defendant pushed the victim, the autopsy evidence introduced in the testimony given by Dr. Rogers established that defendant thereafter inflicted a second fatal wound when, by defendant's own admission to Detective Olmedo, he continued shooting the victim as the victim was falling to the ground. Thus, even if defendant unintentionally fired the first shot, the trial court was not required to instruct the jury on involuntary manslaughter in view of the circumstance that defendant intentionally kept firing his weapon, inflicting at least one other fatal wound.

The jury's verdict finding defendant guilty of the first degree murder of Efrem Baldia implicitly rejected defendant's version of the events—whether that version sought to establish voluntary manslaughter based upon a theory of imperfect self-defense, or involuntary manslaughter based upon a theory that defendant accidentally discharged his firearm—eliminating any doubt that the jury would have returned the same verdict had it been instructed on involuntary manslaughter. (See *People v. Lewis, supra,* 25 Cal.4th 610, 646.) Accordingly, even if we were to assume for the sake of discussion that the trial court's failure to instruct on involuntary manslaughter violated defendant's constitutional rights, we would find the error harmless. (See *People v. Sakarias, supra,* 22 Cal.4th 596, 621.)

### D. *Penalty Phase Issues*

Defendant contends that several features of California's sentencing scheme, alone or in combination, violate the federal Constitution. As defendant acknowledges, we previously have rejected similar challenges, and because defendant has not presented a persuasive reason for us to reconsider those rulings, we decline to do so.

Section 190.3, factor (a), is not overbroad, nor does it allow for the arbitrary and capricious imposition of the death penalty. (*People v. Carter, supra,* 36 Cal.4th 1215, 1278; *People v. Maury* (2003) 30 Cal.4th 342, 439 [133 Cal.Rptr.2d 561, 68 P.3d 1]; *People v. Jenkins* (2000) 22 Cal.4th 900, 1050–1053 [95 Cal.Rptr. 2d 377, 997 P.2d 1044].)[19]

The sentencing guidelines set forth in section 190.3 sufficiently narrow the class of homicide offenders eligible for the death penalty. (*People v. Cox* (2003) 30 Cal.4th 916, 971 [135 Cal.Rptr.2d 272, 70 P.3d 277].)

The trial court is not required to instruct the jury that aggravating factors must be proved beyond a reasonable doubt, that the jury must find beyond a reasonable doubt that the aggravating factors outweigh the mitigating factors, or that death must be found to be appropriate beyond a reasonable doubt. (*People v. Carter, supra,* 36 Cal.4th at p. 1280; *People v. Box, supra,* 23 Cal.4th 1153, 1216; *People v. Bradford* (1997) 14 Cal.4th 1005, 1059 [60 Cal.Rptr.2d 225, 929 P.2d 544]; *People v. Crittenden* (1994) 9 Cal.4th 83, 153 [36 Cal.Rptr.2d 474, 885 P.2d 887].)

Nor is the trial court required to instruct as to standard of proof. (*People v. Box, supra,* 23 Cal.4th 1153, 1216; *People v. Carpenter* (1997) 15 Cal.4th 312, 417–418 [63 Cal.Rptr.2d 1, 935 P.2d 708].) Here, the jury was instructed that "[t]o return a judgment of death, each of you must be persuaded that the aggravating circumstances are so substantial in comparison with the mitigating circumstances that it warrants death instead of life without possibility of parole." That is sufficient. (*Tuilaepa v. California* (1984) 512 U.S. 967, 979 [129 L.Ed.2d 750, 114 S.Ct. 2630] [jury "need not be instructed how to weigh any particular fact in the capital sentencing decision"]; *People v. Davenport* (1995) 11 Cal.4th 1171, 1231 [47 Cal.Rptr.2d 800, 906 P.2d 1068].) "Unlike the guilt determination, 'the sentencing function is inherently moral and normative, not factual' [citation] and, hence, not susceptible to a burden-of-proof quantification." (*People v. Hawthorne* (1992) 4 Cal.4th 43, 79 [14 Cal.Rptr.2d 133, 841 P.2d 118].) The United States Supreme Court decisions rendered in *Ring v. Arizona* (2002) 536 U.S. 584 [153 L.Ed.2d 556, 122 S.Ct. 2428] and *Apprendi v. New Jersey* (2000) 530 U.S. 466 [147 L.Ed.2d 435, 120 S.Ct. 2348] do not compel a different conclusion. (*People v. Smith* (2003) 30 Cal.4th 581, 642 [134 Cal.Rptr.2d 1, 68 P.3d 302]; see also *People v. Prieto* (2003) 30 Cal.4th 226, 275 [133 Cal.Rptr.2d 18, 66 P.3d 1123].)

---

[19] Section 190.3 provides in relevant part: "In determining the penalty, the trier of fact shall take into account any of the following factors if relevant: [¶] (a) The circumstances of the crime of which the defendant was convicted in the present proceeding and the existence of any special circumstances found to be true pursuant to Section 190.1."

Similarly, the trial court did not err in failing to instruct the jury that it must make written findings of the factors it finds in aggravation and mitigation, or in failing to instruct the jury that it must agree unanimously that a particular aggravating circumstance exists. (*People v. Maury, supra,* 30 Cal.4th 342, 440; *People v. Box, supra,* 23 Cal.4th 1153, 1216–1217; *People v. Crittenden, supra,* 9 Cal.4th at p. 153; see also *People v. Snow* (2003) 30 Cal.4th 43, 125–127 [132 Cal.Rptr.2d 271, 65 P.3d 749] [rejecting challenges to California's death penalty law similar to those asserted by defendant here, including the contention that under *Apprendi v. New Jersey, supra,* 530 U.S. 466, and *Ring v. Arizona, supra,* 536 U.S. 584, the sentencing jury must find any aggravating circumstance true beyond a reasonable doubt].)

Contrary to defendant's assertions, (1) the use of unadjudicated criminal activity during the penalty phase is permissible (*People v. Prieto* (2003) 30 Cal.4th 226, 276 [133 Cal.Rptr.2d 18, 66 P.3d 1123]; *People v. Box, supra,* 23 Cal.4th 1153, 1217; *People v. Hart* (1999) 20 Cal.4th 546, 648–649 [85 Cal.Rptr.2d 132, 976 P.2d 683]); (2) the inclusion, in the list of potential mitigating factors read to the jury, of adjectives such as "extreme," in section 190.3, factors (d) and (g), and "substantial," in section 190.3, factor (g), is not error (*People v. Smith, supra,* 30 Cal.4th 581, 642); (3) the trial court is not required to instruct the jury as to which of the listed sentencing factors are aggravating, which are mitigating, and which could be either, depending upon the evidence (*People v. Maury, supra,* 30 Cal.4th 342, 443–444); (4) capital and noncapital defendants are not similarly situated and therefore may be treated differently without violating constitutional guarantees of equal protection of the laws or due process of law (*People v. Johnson* (1992) 3 Cal.4th 1183, 1242–1243 [14 Cal.Rptr.2d 702, 842 P.2d 1]); (5) intercase proportionality review is not required (*People v. Cornwell* (2005) 37 Cal.4th 50, 105 [33 Cal.Rptr.3d 1, 117 P.3d 622]; *People v. Cox, supra,* 30 Cal.4th 916, 969–970; *People v. Prieto, supra,* 30 Cal.4th 226, 276; *People v. Snow, supra,* 30 Cal.4th 43, 126–127); and (6) neither the Eighth Amendment (*People v. Samayoa* (1997) 15 Cal.4th 795, 864–865 [64 Cal.Rptr.2d 400, 938 P.2d 2]) nor international law requires the elimination of capital punishment in California (*People v. Snow, supra,* 30 Cal.4th at p. 127; *People v. Ghent* (1987) 43 Cal.3d 739, 778–779 [239 Cal.Rptr. 82, 739 P.2d 1250]). (See also *People v. Boyette* (2002) 29 Cal.4th 381, 465–467 [127 Cal.Rptr.2d 544, 58 P.3d 391] [rejecting challenges, based on the United States Constitution, similar to those presented by defendant here].)

In view of the foregoing, we reject defendant's various challenges to California's death penalty procedures.

### E.  *Asserted Cumulative Error*

Defendant contends that the cumulative effect of the asserted errors committed at his trial led to a miscarriage of justice, requiring reversal of the guilt and penalty phase judgments. Having determined that none of defendant's assignments of error has merit, we conclude there was no cumulative error requiring reversal.

## DISPOSITION

The judgment is affirmed in its entirety.

Kennard, J., Baxter, J., Werdegar, J., Chin, J., Moreno, J., and Benke, J.,[*] concurred.

---

[*]Associate Justice of the Court of Appeal, Fourth Appellate District, Division One, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.