Filed 6/1/15  P. v. Murray CA2/7

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| THE PEOPLE, | B252166 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. MA042564) |
| v. | |
| JONATHAN MURRAY, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Charles A. Chung, Judge.  Reversed.

Tanya Dellaca, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, Blythe J. Leszkay, Deputy Attorney General, and Garett A. Gorlitsky, Deputy Attorney General, for Plaintiff and Respondent.

_____

Jonathan Murray was charged with the murder of Christopher Elmore. The prosecution's theory at trial was that Murray and his brother, Jason Cutler, chased Elmore on foot and that Cutler then stabbed Elmore in the neck. The jury was instructed that Murray could be found guilty of murder either as a direct aider and abettor or under the natural and probable consequences doctrine, with assault with a deadly weapon serving as the target offense. The jury was also instructed on first and second degree murder. The jury found Murray guilty of first degree murder.

Murray argues we must reverse his conviction under the Supreme Court's recent decision in *People v. Chiu* (2014) 59 Cal.4th 155 (*Chiu*), which held that a defendant cannot be convicted of first degree murder as an aider and abettor under the natural and probable consequences doctrine. We agree and reverse the judgment.

**FACTUAL BACKGROUND**

*A.      Summary of Events Preceding Murray's Trial*

Defendant Jonathan Murray lived in an apartment with his brother, Jason Cutler, his mother, Bernadette Young and his friend, Chris Elmore. The apartment was located in the Lancaster Gardens Apartment Complex, on the northeast corner of Lancaster Boulevard and 5th Street East in Lancaster, California.

On the morning of April 28, 2008, at approximately 2:00 a.m., Los Angeles County Sheriff's Department detective Q. Rodriguez and his partner Shaun McCarthy were called to investigate a homicide near the Lancaster Gardens. When Rodriguez arrived at the scene, he saw Elmore's body in the middle of 5th Street East Street, positioned north of Lancaster Boulevard. Elmore had a stab wound on the left side of his neck. A trail of blood ran from Elmore's body toward a duffel bag located near the curb. A wooden cane and a metal curtain were lying in the street.

Charlette Britt, who lived in a 5th Street East residence located between the area where Elmore's body was found and the Lancaster Gardens, informed police she had found two knives in her front lawn. One knife had a black handle with a small blade; the second knife had a larger "butcher-type" blade and a brown handle. The larger knife had

blood on the blade, which was later determined to match Elmore's DNA. The size and pattern of the blade were consistent with the stab wound on Elmore's neck.

While at the crime scene, Rodriguez and McCarthy interviewed Melvin Chandler, a resident of an apartment located across from the Lancaster Gardens. Chandler stated that at approximately 11:00 p.m., he had seen Elmore, Murray and Cutler exit the Lancaster Gardens and begin fighting. Cutler and Murray appeared to be attacking Elmore, who repeatedly asked to be left alone. Chandler reported that Murray had been swinging a metal pole and that Elmore was using a wooden cane in self-defense. Murray and Cutler eventually went back into the Lancaster Gardens, and Elmore began walking north on 5th Street East holding a duffel bag. Shortly thereafter, Chandler saw Murray and Cutler come back out of the Lancaster Gardens and run north on 5th East Street in the same direction that Elmore had headed. One of the men appeared to be concealing an object under his clothes. Chandler saw Murray and Cutler again minutes later, running south on 5th East Street and back into the Lancaster Gardens. After they entered the building, Bernadette Young came outside and said: "'Those are my sons. That guy disrespected me. They had to do what they had to do.'"

During a subsequent search of Murray's apartment, police recovered a set of knives that had the same rivet patterns and symbols as the brown handled knife that had been recovered from Britt's yard. Murray was arrested and taken into custody.

On May 1, 2008, detectives Rodriguez and McCarthy interrogated Murray, who stated that Elmore had "disrespected" his mother, which "escalated" to a fight in the street. Murray told the detectives he had been hitting Elmore with a metal rod but was then called inside his apartment by his mother. After returning to the apartment, Murray and Cutler each retrieved a knife and began pursuing Elmore. Murray claimed that, while engaged in the pursuit, he decided he did not want to be a part of what was about to occur and discarded his knife, which had a black handle. Murray then returned to the Lancaster Gardens and did not see what happened to Elmore. When Murray awoke the next morning, his brother was not at the apartment.

3

During a second interview on June 5, 2008, Murray told the detectives that he believed he was going to be charged with murder and intended to "plead insanity." When the detectives asked Murray why he thought he was going to be charged with murder, he replied: "I don't know, accessory to murder man. I . . . was there. I had a knife. . . . [M]y brother had a knife and it, it happened. [¶] . . . [¶] Yeah my brother did stab him. And he admitted to everything, that's cool. You know, but it's gonna be, it's everything pinpoint to me man. [¶] . . . [¶] You know, my intentions was to kill his ass. That was my intention cause he [*sic*] said that shit to my momma. . . . I was about to kill him. [¶] . . . [¶] And me and my brother ran down there, I was about to kill him. That was my intention. [¶] . . . [¶] He caught up to him faster than I could."

### B. Trial

On October 9, 2008, the Los Angeles District Attorney's office filed an information charging Murray with murder (§ 187, subd. (a).) The information as amended in November of 2012 further alleged that Murray had used a deadly weapon (a knife) in the commission of the offense (§ 12022, subd. (b)(1)); had suffered one prior serious felony (§ 667, subd. (a)(1)); and suffered one prior serious or violent felony (§§ 667, subs. ((b)-(i) § 1170.12, subs, (a)-(d).)

At trial, the prosecution called four witnesses: the responding officer who had found Elmore's body in 5th Street East; a coroner who testified that Elmore had died from the knife wound in his neck; Charlette Britt; and detective Rodriguez, who summarized what he had seen at the crime scene and what Chandler had told him during the interview on the morning of April 28th. The jury also heard recordings of Murray's two interviews with detectives Rodriguez and McCarthy; a transcript from Melvin Chandler's preliminary hearing testimony was read.[1] At that hearing, Chandler denied having told detectives Rodriguez and McCarthy that he witnessed any of the events that

---

[1]    The parties stipulated that Chandler was unavailable to testify and that his preliminary hearing testimony could be read into evidence.

4

occurred on April 28th and denied each and every statement that detective Rodriguez had attributed to him. Murray did not present any witnesses or evidence.

Prior to closing argument, the jury was instructed on "principals" (CALJIC 3.00[2]) and aiding and abetting (CALJIC 3.01).[3] The jury also received the following instruction on the natural and probable consequences doctrine: "One who aids and abets another in the commission of a crime is not only guilty of that crime, but is also guilty of any other crime committed by a principal which is a natural and probable consequence of the crime originally aided and abetted. In order to find the defendant guilty of the crime of murder, under this theory, as charged in Count 1, you must be satisfied beyond a reasonable doubt that: [¶] 1. The crime of assault with a deadly weapon in violation of Penal Code section 245 (a)(1) was committed; [¶] 2. That the defendant aided and abetted that crime; [¶] 3. That a co-principal in that crime committed the crime of murder; and [¶] 4. The crime of murder was a natural and probable consequence of the commission of the crime of assault with a deadly weapon in violation of Penal Code section 245 (a)(1). [¶] In determining whether a consequence is 'natural and probable,' you must apply an objective test, based not on what the defendant actually intended, but on what a person of reasonable and ordinary prudence would have expected likely to occur. . . ."

---

[2] The instruction on "principals" stated, in relevant part: "Persons who are involved in [committing] a crime are referred to as principals in that crime. Each principal, regardless of the extent or manner of participation is [guilty of a crime.] Principals include: [¶] 1. Those who directly and actively [commit] the act constituting the crime, or [¶] 2. Those who aid and abet the [commission] of the crime. [¶] [When the crime charged is [murder], the aider and abettor's guilt is determined by the combined acts of all the participants as well as that person's own mental state. If the aider and abettor's mental state is more culpable than that of the actual perpetrator, that person's guilt may be greater than that of the actual perpetrator. Similarly, the aider and abettor's guilt may be less than the perpetrator's, if the aider and abettor has a less culpable mental state.]"

[3] The instruction on aiding and abetting stated, in relevant part: "A person aids and abets the [commission] of a crime when he or she: [¶] (1) With knowledge of the unlawful purpose of the perpetrator, and [¶] (2) With the intent or purpose of committing or encouraging or facilitating the commission of the crime, and [¶] (3) By act or advice, aids, promotes, encourages or instigates the commission of the crime."

5

The court also instructed the jury that if it found Murray guilty of murder, it was required to determine whether the murder was of the first or second degree. (CALJIC 8.7.) The court provided the following instruction on "deliberate and premeditated murder," modeled after CALJIC 8.20: "All murder which is perpetrated by any kind of willful, deliberate and premeditated killing with express malice aforethought is murder of the first degree [¶] . . . [¶] If you find that the killing was preceded and accompanied by a clear, deliberate intent on the part of the defendant to kill, which was the result of deliberation and premeditation, so that it must have been formed upon pre-existing reflection and not under a sudden heat of passion or other condition precluding the idea of deliberation, it is murder of the first degree [¶] . . . [¶] To constitute a deliberate and premeditated killing, the slayer must weigh and consider the question of killing and the reasons for and against such a choice and, having in mind the consequences, [he] decides to and does kill." The Court also instructed the jury on second degree murder. (CALJIC 8.30 & 8.31.)

At closing argument, the prosecutor initially focused on direct aider and abettor liability, arguing that the statements Murray made during his second interview confirmed that he had acted with the intent to aid Cutler in the premeditated killing of Elmore. However, the prosecution also argued that there was "another way that this is also shown to be a murder," explaining: "There is the law of a principal's liability for natural and probable consequences. And this goes back to . . . where if Cutler had run out of that apartment with the intent to cut Elmore up, not to kill him but to . . . assault him with the knife, it's called assault with a deadly weapon if [] Cutler has that intention. And a natural and probable consequence of that is that if somebody is murdered, then the aider and abettor is liable for the murder. . . . [] Murray, even if he didn't intend to aid and abet a murder, is guilty of the murder because the murder . . . is a natural and probable consequence of that assault with a knife. And the court gave you this information. I believe it's clear that the intent of both brothers was to commit the murder, but even if the intent had been an assault with a knife, not a murder, under this theory[,] the natural, probable consequence theory, [] Murray is guilty of the murder that was committed in

6

the course of that attack with the knife." The prosecutor later reiterated the natural and probable consequences doctrine, stating: "And what we know from the instruction . . . about reasonable and probable consequences, when Jason Cutler and Jonathan Murray chase Christopher Elmore down with knives with the intent to assault him with the knives, the murder occurs and Jonathan Murray is guilty of the murder."

Defense counsel argued that the jury should credit Murray's statements at the first interview that although he did initially join Cutler in pursuing Elmore, he terminated his pursuit and returned to the apartment without seeing what happened to Elmore. Counsel contended that Murray's statements at the second interview, during which he said he had intended to kill Elmore, were unreliable because he had been in custody for over 30 days and had stopped caring what happened to him. Defense counsel also argued that Murray's admissions at the second interview were likely the result of his mental illness.

The jury found Murray guilty of first degree murder. At a bifurcated hearing, Murray admitted to his prior strike. He was sentenced to 55 years to life in prison.[4]

## DISCUSSION

### A. *The Court Erred in Instructing the Jury on the Natural and Probable Consequences Doctrine*

Murray argues that under *Chiu, supra,* 59 Cal.4th 155, which was decided during the pendency of his appeal, we must reverse his conviction because the trial court failed to instruct the jury that it could not find him guilty of premeditated first degree murder based on the natural and probable consequences doctrine.

#### 1. *Summary of Chiu*

In *Chiu, supra,* 59 Cal.4th 155, the defendant was involved in an altercation during which his companion shot and killed the victim. The parties presented conflicting

---

**4** The court sentenced Murray to 25 years to life in prison for first degree murder, which the court doubled to 50 years to life in prison as the result of his prior strike. (See § 667, subds. (b)-(i).) The court added a 5 year consecutive term for a prior serious felony. (§ 667, subd. (a).)

evidence at trial regarding the defendant's role in the shooting. A witness for the prosecution testified that the defendant had directed his companion to go "'[g]rab the gun'" and then encouraged his companion to shoot the victim. (*Id*. at p. 170.) Defendant, however, testified that he was unaware his companion had a gun and had never encouraged his companion to shoot the victim. "The prosecution set forth two alternate theories of liability. First, defendant was guilty of murder because he directly aided and abetted [his companion] in the shooting death of [the victim]. Second, defendant was guilty of murder because he aided and abetted [his companion] in the target offense of assault or of disturbing the peace, the natural and probable consequence of which was murder." (*Id*. at p. 160)

The trial court instructed the jury that, to determine whether the defendant was guilty of murder under the natural and probable consequences doctrine, it had to decide "(1) whether he was guilty of the target offense (either assault or disturbing the peace); (2) whether a coparticipant committed a murder during the commission of the target offense; and (3) whether a reasonable person in defendant's position would have known that the commission of the murder was a natural and probable consequence of the commission of either target offense." (*Chiu, supra,* 59 Cal.4th at pp. 160-161.) The court also instructed the jury that if it "found defendant guilty of murder as an aider and abettor, it had to determine whether the murder was in the first or second degree. It then instructed that to find defendant guilty of first degree murder, the People had to prove that the perpetrator acted willfully, deliberately, and with premeditation . . . ." (*Id.* at p. 161.) The jury found the defendant guilty of first degree murder. The Supreme Court granted review to address "how to instruct the jury on aider and abettor liability for first degree premeditated murder under the natural and probable consequences doctrine." (*Id*. at p. 162.)

The Court began its analysis by providing a summary of the natural and probable consequences doctrine: "Aider and abettor culpability under the natural and probable consequences doctrine is vicarious in nature. [Citation.] 'By its very nature, aider and abettor culpability under the natural and probable consequences doctrine is not premised

8

upon the intention of the aider and abettor to commit the nontarget offense because the nontarget offense was not intended at all.  It imposes vicarious liability for any offense committed by the direct perpetrator that is a natural and probable consequence of the target offense. [Citation.]  Because the nontarget offense is unintended, the mens rea of the aider and abettor with respect to that offense is irrelevant and culpability is imposed simply because a reasonable person could have foreseen the commission of the nontarget crime.'  [Citation.]"  (*Chiu*, *supra*, 59 Cal.4th at p. 164.)

The Court also described the public policy underlying the doctrine:  "In the context of murder, the natural and probable consequences doctrine serves the legitimate public policy concern of deterring aiders and abettors from aiding or encouraging the commission of offenses that would naturally, probably, and foreseeably result in an unlawful killing.  A primary rationale for punishing such aiders and abettors – to deter them from aiding or encouraging the commission of offenses – is served by holding them culpable for the perpetrator's commission of the nontarget offense of second degree murder.  [Citation.]"  (*Chiu*, *supra*, 59 Cal.4th at p. 165.)  The Court further concluded, however, that "this same public policy concern loses its force in the context of a defendant's liability as an aider and abettor of a first degree premeditated murder.  First degree murder, like second degree murder, is the unlawful killing of a human being with malice aforethought, but has the additional elements of willfulness, premeditation, and deliberation which trigger a heightened penalty.  [Citation.]  That mental state is uniquely subjective and personal. . . . [W]hether a direct perpetrator commits a nontarget offense of murder with or without premeditation and deliberation has no effect on the resultant harm.  The victim has been killed regardless of the perpetrator's premeditative mental state.  Although we have stated that an aider and abettor's 'punishment need not be finely calibrated to the criminal's mens rea' [citation], the connection between the defendant's culpability and the perpetrator's premeditative state is too attenuated to impose aider and abettor liability for first degree murder under the natural and probable consequences doctrine, especially in light of the severe penalty involved and the above-stated public policy concern of deterrence."  (*Chiu, supra*, 59 Cal.4th at p. 166.)

9

For these reasons, the Supreme Court held "that punishment for second degree murder is commensurate with a defendant's culpability for aiding and abetting a target crime that would naturally, probably, and foreseeably result in a murder under the natural and probable consequences doctrine. . . . [W]here the direct perpetrator is guilty of first degree premeditated murder, the legitimate public policy considerations of deterrence and culpability would not be served by allowing a defendant to be convicted of that greater offense under the natural and probable consequences doctrine." (*Chiu, supra*, 59 Cal.4th at p. 166.) The Court clarified, however, that "[a]iders and abettors may still be convicted of first degree premeditated murder based on direct aiding and abetting principles. [Citation.] Under those principles, the prosecution must show that the defendant aided or encouraged the commission of the murder with knowledge of the unlawful purpose of the perpetrator and with the intent or purpose of committing, encouraging, or facilitating its commission. [Citation.]" (*Id.* at pp. 166-167.)

The Court also addressed the issue of prejudice. The instructions in *Chiu* allowed the jury to convict the defendant of first degree murder either as a direct aider and abettor (which was proper) or under the natural and probable consequences doctrine (which was not). The Court explained that "[w]hen a trial court instructs a jury on two theories of guilt, one of which was legally correct and one legally incorrect, reversal is required unless there is a basis in the record to find that the verdict was based on a valid ground. [Citation.] Defendant's first degree murder conviction must be reversed unless we conclude beyond a reasonable doubt that the jury based its verdict on the legally valid theory that defendant directly aided and abetted the premeditated murder." (*Chiu, supra*, 59 Cal.4th at p. 167.) Applying this test, the Court found that the jury's questions during deliberations indicated that it "may have based its verdict of first degree premeditated murder on the natural and probable consequences theory." (*Ibid.*) As a result, the Court concluded it could not find "beyond a reasonable doubt that the jury ultimately based its first degree murder verdict on a different theory, i.e., the legally valid theory that defendant directly aided and abetted the murder." (*Id.* at p. 168.)

10

The Court also explained that, under the circumstances, the proper remedy was to reverse the defendant's first degree murder conviction and permit the People to elect whether "to accept a reduction of the conviction to second degree murder or to retry the greater offense." (*Chiu, supra*, 59 Cal.4th at p. 168.)

### 2. *The trial court committed instructional error*

As in *Chiu*, the jury in this case was instructed that it could find Murray guilty of murder under either a direct aider and abettor theory or under the natural and probable consequences doctrine. The jury instruction on the natural and probable consequences doctrine was essentially identical to the instruction provided in *Chiu*, informing the jury that it could find Murray guilty of murder if it determined that: (1) he had aided and abetted the target offense of assault with a deadly weapon; (2) a co-principal in that crime committed the crime of murder; and (3) a reasonable person in defendant's position would have known that the commission of the murder was likely to occur as a consequence of the target offense. The jury was further instructed that if it found Murray guilty of murder, it had to decide whether the murder was of the first or second degree and was provided definitions of each type of murder.

Despite the obvious similarities between this case and *Chiu*, the People contend no instructional error occurred here because the court's instruction on premeditated first degree murder (CALJIC 8.20) contained the following provision: "If you find that the killing was preceded and accompanied by a clear, deliberate intent on the part of the defendant to kill, which was the result of deliberation and premeditation, so that it must have been formed upon pre-existing reflection and not under a sudden heat of passion or other condition precluding the idea of deliberation, it is murder of the first degree." The People argue this language clarified for the jury that first degree murder was only appropriate if the "defendant" (Murray), rather than the "perpetrator" of the murder (Cutler), acted with premeditated intent to kill. The People contrast this language with the premeditated murder instruction provided in *Chiu*, in which the jury was told that the People had to prove that the "perpetrator" acted willfully, deliberately, and with

11

premeditation.  (*Chiu, supra*, 59 Cal.4th at p. 161.)  The People further contend that because we must presume the jury followed the instructions properly, it could not have returned a finding of first degree murder without also finding that Murray harbored a premeditated intent to kill.

Although CALJIC 8.20 does refer to the "defendant's" intent, other language in the instruction suggests that a finding of first degree murder may also be based on the intent of the perpetrator of the killing.  The first sentence of the instruction states:  "All murder which is perpetrated by any kind of willful, deliberate and premeditated killing with express malice aforethought is murder of the first degree."  This statement implies that first degree murder is appropriate whenever the killing was "perpetrated" with the requisite intent, regardless of which principal harbored such intent.  The last sentence of the instruction provides:  "To constitute a deliberate and premeditated killing, the slayer must weigh and consider the question of killing and the reasons for and against such a choice and, having in mind the consequences, [he] [she] decides to and does kill."  Again, this statement  suggests that if the perpetrator of the murder ("the slayer") acted with the requisite intent, the murder is of the first degree.  Thus, considered as a whole CALJIC 8.20 effectively invited the jury to find first degree murder based on either the defendant's own intent or the intent of the perpetrator.

The jury was also instructed under CALJIC 3.31, which states:  "In the crime of [murder], there must exist a union or joint operation of act or conduct and a certain specific intent in the mind of the perpetrator.  Unless this specific intent exists the crime to which it relates is not committed.  The specific intent required is included in the definition of the crime set forth elsewhere in these instructions."  By referencing the specific intent "of the perpetrator," this instruction effectively invited the jury to consider whether the "perpetrator" of the murder acted with the specific intent set forth in the instruction on premeditated murder.

In sum, we reject the People's contention that CALJIC 8.20's single reference to the defendant's intent is sufficient to distinguish this case from *Chiu*.

12

### 3. *The error was not harmless*

Having concluded that instructional error occurred, we must next determine whether the error was harmless. *Chiu* sets forth the specific test a reviewing court must apply when assessing whether the type of instructional error at issue here was harmless: "Defendant's first degree murder conviction must be reversed unless we conclude beyond a reasonable doubt that the jury based its verdict on the legally valid theory that defendant directly aided and abetted the premeditated murder." (*Chiu, supra*, 59 Cal.4th at p. 167.)

In this case, the record contains no information demonstrating that the jury's first degree murder verdict was based on the direct aider and abettor theory rather than on the natural and probable consequences doctrine. Murray's statement at the second interview that he intended to kill Elmore was certainly sufficient to support a finding of guilt under a direct aider and abettor theory. However, this evidence does not demonstrate beyond a reasonable doubt that the jury actually relied on such a theory. The jury might have alternatively concluded that it need not determine whether Murray really intended to kill Elmore because there was sufficient evidence that: (1) he aided and abetted Cutler in an assault with a deadly weapon by initially pursuing Elmore with a knife; (2) that Cutler committed first degree murder in the course of the assault; and (3) Cutler's conduct was a natural and probable consequence of the assault.

This latter theory of liability essentially comports with Murray's own version of the facts at closing argument. Defense counsel argued to the jury that it should credit Murray's first statement to the police, in which he claimed that while he did join his brother in pursuing Elmore while armed with a knife, he ultimately decided to stop his pursuit, discard his weapon and return to the apartment. Defense counsel argued that this statement was more believable than Murray's subsequent statement that he intended to kill Elmore, which he made only after having been detained for over 30 days. The jury may well have concluded that, under the natural and probable consequences doctrine, it was not required to determine whether Murray was being truthful in his second interview because he had essentially admitted he did intend to aid and abet Cutler in assaulting

13

Elmore with a knife and there was overwhelming evidence that Cutler's killing of Elmore was both premeditated (evidenced by the fact that he chased down the victim and stabbed him in the neck[5]) and a natural and probable consequence of an assault with a deadly weapon. There is simply no way for us to conclude, beyond a reasonable doubt, that this is not the theory on which the jury relied.

The People disagree, arguing that two factors demonstrate the court's instructional error was harmless. First, they contend the error was harmless because there was "overwhelming evidence of [Murray's] premeditated intent." As explained above, we do not disagree that the prosecutor introduced substantial evidence that Murray did intend to kill Elmore and that such evidence would support a first degree murder conviction under a direct aider and abettor theory. However, under *Chiu*, the proper inquiry is whether the record demonstrates beyond a reasonable doubt what theory of liability the jury actually relied on in returning its verdict. Nothing in the record allows us to make that determination.

Second, the People argue the error was harmless because the record shows the prosecutor informed the jury that it should only "convict on first degree premeditated murder . . . if it found that both [Murray] and Cutler had the premeditated and deliberate intent to kill." According to the People, when "the prosecutor discussed the natural and probable consequence doctrine, he explicitly contrasted it with first degree murder, indicating that the natural and probable consequences doctrine only applied to second degree murder."

We disagree with the People's contention that the prosecutor "explicitly" informed the jury that it could only convict Murray of second degree murder under the natural and probable consequences doctrine. During closing argument, the prosecutor initially discussed direct aider and abettor liability, arguing that the evidence showed Murray acted with the intent to aid Cutler in the premeditated killing of Elmore. The prosecutor then turned to the natural and probable consequences doctrine, explaining that although

---

[5]    The prosecutor specifically argued to the jury that the size and placement of the stab wound on Elmore demonstrated that Cutler "manifest[ed] an intent to kill."

14

he believed the evidence showed "first degree murder" based on Murray's "intent to kill," the natural and probable consequences doctrine provided "another way . . . this is . . . shown to be a murder." The prosecutor then described why Murray was guilty of murder under the doctrine: "Murray, even if he didn't intend to aid and abet a murder, is guilty of the murder because the murder . . . is a natural and probable consequence of that assault with a knife. . . . I believe that the intent of both brothers was to commit the murder, but even if the intent had been an assault with a knife, not murder, under this theory the natural, probable consequences theory, [] Murray is guilty of the murder that was committed in the course of that attack with the knife."

These statements make clear that the prosecutor did not distinguish between first and second degree murder when discussing the natural and probable consequences doctrine. Based on the prosecutor's statements, the jurors could have reasonably concluded that they could find Murray guilty of first degree murder based on either his own personal intent to kill Elmore or under the natural and probable consequences doctrine.

### B. The Trial Court Did Not Err in Refusing an Instruction on Voluntary Manslaughter

Murray also argues the trial court erred by denying his request for an instruction on the lesser included offense of voluntary manslaughter. (See *People v. Thomas* (2012) 53 Cal.4th 771, 813 ["voluntary . . . manslaughter [is a] lesser included offense[] of murder"].) At trial, Murray's counsel argued that the instruction was warranted based on Murray's statement that that he had attacked Elmore because Elmore had "disrespected" his mother. According to counsel, this statement raised an inference that Murray's actions were caused by the "anger and passion that was aroused in him" by Elmore's "rude, disrespectful statements." Alternatively, counsel argued a voluntary instruction was appropriate because the evidence showed Elmore had been swinging a cane at Murray shortly before Elmore was killed. Counsel contended this evidence suggested

15

Murray's "blood [wa]s [still] boiling" from the altercation when he and Cutler chased down Elmore.

The court denied the instruction, explaining that although the evidence suggested Murray had reacted to a "disrespectful" comment Elmore made to the defendant's mother, the jury was never told what Elmore actually said. The court concluded that, in the absence of such evidence, no reasonable juror could find "a passion . . . was aroused so strongly that it would negate malice." The court also concluded there was insufficient evidence that Elmore's killing was the result of a physical provocation: "While it is true there was evidence that the victim wielded a cane, it seems to be from all the evidence that the victim was trying to defend himself, where he was telling the defendant, look, 'I'm leaving,' 'Leave me alone,' and he is trying to protect himself with the cane. . . . While I recognize the defendant said in a statement the victim was swinging his cane, there was nothing else in his interview that that seemed to indicate that his passion had been aroused to the point where it negated malice. So that request is denied."

### 1. Summary of applicable law

"A trial court must instruct on a lesser included offense if substantial evidence exists indicating that the defendant is guilty only of the lesser offense. '"Substantial evidence" in this context is '"evidence from which a jury composed of reasonable [persons] could . . . conclude [ ]'" that the lesser offense, but not the greater, was committed. [Citations.]' [Citation.]" (*People v. Manriquez* (2005) 37 Cal.4th 547, 584 (*Manriquez*).) "'In deciding whether there is substantial evidence of a lesser offense, courts should not evaluate the credibility of witnesses, a task for the jury.' [Citations.]" (*Id*. at p. 585.) "[O]n appeal we employ a de novo standard of review and independently determine whether an instruction on [a] lesser included offense . . . should have been given." (*Ibid.*)

An intentional killing is reduced from murder to voluntary manslaughter if the evidence negates malice by showing the defendant acted upon a sudden quarrel or in the heat of passion. (§ 192, subd. (a); *Manriquez, supra*, 37 Cal.4th at p, 583.) "'[T]he

16

factor which distinguishes the 'heat of passion' form of voluntary manslaughter from murder is provocation.  The provocation which incites the defendant to homicidal conduct in the heat of passion must be caused by the victim [citation], or be conduct reasonably believed by the defendant to have been engaged in by the victim.  [Citations.] The provocative conduct by the victim may be physical or verbal, but the conduct must be sufficiently provocative that it would cause an ordinary person of average disposition to act rashly or without due deliberation and reflection.  [Citations.]'  [Citation.]" (*Manriquez, supra,* 37 Cal.4th at p. 583.)

The provocation requirement for voluntary manslaughter has both a subjective and an objective component: (1) the defendant must actually and subjectively kill under the impulse of a sudden quarrel or the heat of passion; and (2) the provocation "'must be such that an average, sober person would be so inflamed that he or she would lose reason and judgment.'" (*Manriquez, supra,* 37 Cal.4th at pp. 585-586).  If either component of provocation is absent, the killing is not voluntary manslaughter, and the trial court need not instruct on this type of manslaughter as a lesser included offense of murder.  (*Id.* at p. 586.)

Applying those standards here, we conclude that that Murray failed to identify any substantial evidence that would support a finding of voluntary manslaughter.  Murray first argues that there was evidence suggesting his conduct was the result of a "disrespectful" comment that Elmore made to his mother.  A "disrespectful" comment, however, is generally not sufficient to support an instruction on voluntary manslaughter. (See *People v. Gutierrez* (2009) 45 Cal.4th 789, 826 [a "voluntary manslaughter instruction is not warranted where the act that allegedly provoked the killing was no more than taunting words"].)  Moreover, in this particular case, Murray failed to introduce any evidence at trial specifying what specific words Elmore spoke to his mother.  As the trial court observed, in the absence of such evidence, there was no basis for the jury to

17

conclude the statement would have caused an ordinary person to act rashly and without deliberation.[6]

There is likewise no evidence that would permit a reasonable trier of fact to conclude that Elmore provoked Murray by swinging a cane at him. Murray does not dispute that he and his brother initially confronted Elmore outside the apartment building based on the comments Elmore had made about their mother. Thus, the undisputed evidence shows Murray and Cutler, not Elmore, initiated the confrontation during which the cane was swung. (*Manriquez, supra*, 37 Cal.4th at p. 583 ["The provocation which incites the defendant to homicidal conduct in the heat of passion must be caused by the victim"].) Moreover, the only evidence regarding this confrontation was that Elmore was asking to be left alone and eventually walked away from the apartment building. Murray does not dispute that as Elmore left, he and his brother returned to the apartment to retrieve knives and then chased Elmore. Based on these undisputed facts, no reasonable trier of fact could conclude that Elmore's act of swinging a cane during a confrontation, and then leaving the scene, would cause an ordinary person to retrieve a knife, chase the victim down and stab him in the neck.

---

[6] Murray alternatively contends that his attorney's failure to introduce evidence of the actual statement that Elmore made constituted ineffective assistance of counsel. "'In general, the proper way to raise a claim of ineffective assistance of counsel is by writ of habeas corpus, not appeal. [Citations.] . . . [A]n ineffective assistance claim may be reviewed on direct appeal [only] where "there simply could be no satisfactory explanation" for trial counsel's action or inaction. [Citation.]' [Citations.] Usually, however, '[t]he establishment of ineffective assistance of counsel most commonly requires a presentation which goes beyond the record of the trial. . . . Action taken or not taken by counsel at a trial is typically motivated by considerations not reflected in the record. . . . Evidence of the reasons for counsel's tactics, and evidence of the standard of legal practice in the community as to a specific tactic, can be presented by declarations or other evidence filed with the writ petition. [Citation.]' [Citations]." (*In re Darlice C.* (2003) 105 Cal.App.4th 459, 463.) In this case, Murray contends his attorney had intended to introduce the specific statement that Elmore made at trial, but simply forgot to do so. However, he has introduced no evidence, such as a declaration from counsel, confirming these assertions. Accordingly, the issue is more appropriately resolved in a habeas corpus proceeding.

## DISPOSITION

Murray's judgment is reversed, and the trial court is directed to give the People the option of accepting a reduction in the conviction to second degree murder or retrying the case against Murray.


ZELON, J.

We concur:


PERLUSS, P. J.


STROBEL, J.[*]

---

[*] Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.