Filed 5/15/24  P. v. Whalen CA2/6

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION SIX

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>KENNETH ROBBIE WHALEN,<br><br>    Defendant and Appellant. | 2d Crim. No. B326184<br>(Super. Ct. No. 18CR05267)<br>(Santa Barbara County) |

Kenneth Robbie Whalen appeals a judgment following his conviction of second degree murder (Pen. Code, § 187, subd. (a), 189) with jury findings that he personally used a deadly weapon (§ 12022, subd. (b)).  He was sentenced to 16 years to life in state prison.  We conclude, among other things, that the trial court properly instructed the jury on imperfect self-defense.  We affirm.

## FACTS

On April 3, 2018, Theopheus Bennett made a 911 emergency call.  He told the dispatcher he was stabbed in the

park and "I'm bleeding to death." He said he got jumped by "[m]en, I think." They had a knife.

Police Officer David Garza responded and went to the "Barkin' Dog Park" in Lompoc, California. He went to assist Bennett who had "multiple stab wounds on his upper back and his lower back." He remained with Bennett until the ambulance arrived. Garza testified that Bennett was unarmed. He had no weapons, knives, or any "sharp cutting instruments."

Bennett died at the hospital. Doctor Manny Montez, a county forensic pathologist, testified that the cause of death was "multiple stab wounds." The depth of the stab wounds to Bennett's back ranged from "four to six inches deep."

Ricardo Perea, an "acquaintance" of Whalen's, testified Whalen told him about an incident at the dog park. Whalen said a man woke him going through his belongings. "So [Whalen] grabbed his knife [and] stabbed him. The guy ran away. [Whalen] ran after him and continued stabbing him." Whalen said he "killed somebody." Perea told Whalen that "it doesn't look good" when you stab somebody in the back. Whalen said, "I know." Whalen then asked, "something to the effect," "[W]hat was I supposed to do, let him go?"

Amanda Bobbitt, a friend of Whalen's, testified that Whalen told her about the incident at the dog park. Whalen said he woke up and someone was reaching over him. He stabbed the person. That person "ran away." Whalen said he chased that person and 'kept stabbing him." He said he "just couldn't stop." He "snapped."

In an initial police interview, Whalen said he did not know "anything about" the killing of Bennett at the dog park. In a

second interview, he said he "wasn't down there that night." He was at a "hotel."

In a subsequent police interview, Whalen made a confession. He said he had a knife in his hand after Bennett said, "Don't fucking move." He was asked, "Do you know where on his body you hit him?" With a gesture Whalen said, "[R]ight here." He then "followed" Bennett and "[stood] over him." He was asked, "And then you stabbed him a few more times?" Whalen responded, "Yeah." After that Whalen said, "I ran off."

Bennett was wearing a GPS tracking device as a result of having been placed on probation. The police obtained the GPS coordinates tracking records showing Bennett's movements at the time of the incident. Those movements were consistent with Bennett "running away." The police conducted a search of the park with a search team and metal detectors. No weapons were found. A police officer found two blood pools in the park. One blood pool was 148 feet from the park's play structure where Whalen had been sleeping. The other was 221 feet from that area.

In the defense case, Whalen testified that he was homeless. He often slept in the park and he owned a knife. On April 3, 2018, he was sleeping in the park's "play structure" area. He woke up and saw Bennett "leaning over" him. Bennett said, "Don't fucking move." Bennett had something in his right hand. Whalen testified he was "really scared." He stabbed Bennett with his knife.

The stab wound caused Bennett to "run away" or "retreat." Whalen testified Bennett "jumped over the side of the rail" near the park play structure.

Whalen got up and "proceeded down the stairs" near the park play structure. When he got to the bottom, he saw Bennett holding a knife. Bennett "lunged" for Whalen's knife and "grabbed" it. Whalen "pulled the knife out slicing [Bennett's] hand."

Whalen testified the injury to Bennett's hand caused Bennett to step "back a few steps as [Whalen was] moving forward." Bennett turned "and [Whalen] struck him again . . . two more times." After suffering these two wounds, Bennett began to "fall." "[Bennett] stumbled, and then I struck him two more times." Whalen said he did not intend to kill Bennett. He just wanted to "make it out of there alive, to survive." Whalen did not contact law enforcement because he felt they would not believe him. Whalen's cell phone had an image with the phrase "death follows a thief." This was from a video game application. He was not truthful in his first interviews with the police. He did not recall telling the police that he stabbed Bennett in his back while he was on the ground.

## DISCUSSION

### *The Jury Instruction*

Whalen contends the trial court erred in instructing the jury on imperfect self-defense. He claims the court failed to include an instruction that a defendant must be acquitted of murder under the imperfect self-defense doctrine when he has a "sincere belief in the necessity of his actions to repel an imminent robbery." (Initial capitalization omitted.)

The trial court instructed the jury with CALCRIM No. 571. It provided, in relevant part, "A killing that would otherwise be murder is reduced to voluntary manslaughter if the defendant killed a person because he acted in imperfect self-defense. [¶] . . .

4

The defendant acted in imperfect self-defense if: [¶] 1. The defendant actually believed that he was in imminent danger of being killed or suffering great bodily injury; [¶] AND [¶] 2. The defendant actually believed that the immediate use of deadly force was necessary to defend against the danger; [¶] BUT [¶] 3. At least one of those beliefs was unreasonable."

CALCRIM No. 571 provided the jury with the correct and necessary elements of imperfect self-defense. (*People v. Manriquez* (2005) 37 Cal.4th 547, 581; *In re Christian S*. (1994) 7 Cal.4th 768, 773; *People v. Vasquez* (2006) 136 Cal.App.4th 1176, 1178.) A defendant must have "an actual belief in the need for self-defense against an imminent danger to life or great bodily injury." (*People v. Manriquez, supra*, 37 Cal.4th at p. 581.) "Imperfect self-defense is the actual, but unreasonable, belief in the need to resort to self-defense to protect oneself from imminent peril." (*Vasquez*, at p. 1178.) The instruction properly included the need "to defend oneself from imminent peril to life or great bodily injury." (*Christian S.*, at p. 773.)

Whalen's claim that he had an independent right to an imperfect self-defense instruction because he acted "to repel an imminent robbery" is incorrect. A robbery, by itself, does not show that he was in imminent danger so that he could use deadly force. (*People v. Morales* (2021) 69 Cal.App.5th 978, 991-992.)

In *Morales*, a defendant made a similar claim for a self-defense instruction based on a victim's "attempt to rob him was itself a sufficient basis for his requested instruction without regard to any danger of great bodily injury or death." *(People v. Morales, supra*, 69 Cal.App.5th at p. 991.) The court rejected the claim. "[W]e are not convinced that a mere robbery, without more, will give rise to the right of self-defense with deadly

5

force . . . ." (*Id*. at p. 992.) "A robbery . . . cannot trigger the right to use deadly force in self-defense unless the circumstances of the robbery gave rise to a reasonable belief that the victim would suffer great bodily injury or death." (*Ibid*.) "[T]he touchstone for self-defense remains the reasonable belief of the danger of great bodily injury or death, *not the threat of a robbery in and of itself*." (*Ibid*.; italics added.)

This reasoning also applies to imperfect self-defense instructions because they also require that the defendant "actually believes that he or she is *in imminent danger of being killed* or suffering great bodily injury." (*People v. Morales*, *supra*, 69 Cal.App.5th at p. 995, italics added.) In *Morales*, the court also held, "[I]f a defendant unreasonably believes someone is going to punch him in the arm and stabs him to death in response, 'this belief would not support a claim of imperfect self-defense for the reason that the belief, even if reasonable, would not permit the use of deadly force.' " (*Ibid*.)

Whalen notes that the trial court gave the jury a self-defense instruction that included the danger of robbery. It provided, in relevant part, "the defendant acted in lawful self-defense if: [¶] 1) The defendant reasonably believed that he was in imminent danger of being killed or suffering great bodily injury or *was in imminent danger of being robbed*." (CALCRIM No. 505, italics added.) Whalen's claim that the court should have modified the imperfect self-defense instruction by adding the same robbery language that was added to the self-defense instruction is incorrect and beside the point.

The issue is the validity of the imperfect self-defense instruction. The trial court did not have a sua sponte duty to modify the instruction in a manner that would be inconsistent

6

with case law.  The imperfect self-defense instruction as given was proper.  (*People v. Morales*, *supra*, 69 Cal.App.5th at pp. 991-992; see also *People v. Manriquez*, *supra*, 37 Cal.4th at p. 581.)

The jury was instructed with CALCRIM No. 3474 which provides, "The right to use force in self-defense continues only as long as the danger exists or reasonably appears to exist.  When the attacker withdraws or no longer appears capable of inflicting any injury, then the right to use force ends.  Whalen testified he initially stabbed Bennett, which caused Bennett to "run away" or "retreat."  He said Bennett "jumped over the side of the rail" to get away down the stairs.

Whalen's claim that he was repelling a robbery when he killed Bennett is not applicable because Bennett was not committing a robbery at the time he was killed.  He was *fleeing from* Whalen.  Whalen followed Bennett carrying a knife.  When Whalen caught up to him, Whalen stabbed Bennett multiple times in the back.  Whalen's testimony about the incident was refuted by the scientific and crime scene evidence.  The GPS evidence showed Bennett was running away.  The police park crime scene investigation showed Bennett was unarmed.  The blood pool evidence showed Whalen's testimony about where the killing took place was not true.  Whalen's testimony that Bennett sustained a hand injury when he allegedly tried to take the knife from Whalen is contradicted by the medical evidence.

Whalen's admissions to Perea and Bobbitt impeached his trial testimony and showed that he was not acting in self-defense.  The phrase on Whalen's cell phone that "death follows a thief" is evidence of Whalen's motive and state of mind.  Whalen admitted lying to the police which shows his consciousness of guilt.  He subsequently confessed to police that he followed Bennett, stood

7

"over him," and stabbed him "a few more times." That admission coupled with stabbing Bennett in the back undermined Whalen's claim of self-defense and impeached his trial testimony. Whalen's trial testimony also includes highly incriminating admissions that he attacked Bennett while he was retreating, wounded, falling down, and stumbling. Whalen testified that while Bennett turned away, "I struck him . . . two more times." Bennett began to "fall." "He stumbled, and then I struck him two more times." Bennett's multiple back wounds ranged "from four to six inches deep."

DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED.


GILBERT, P. J.

We concur:


BALTODANO, J.


CODY, J.


8

Von N. Deroian, Judge

Superior Court County of Santa Barbara

_____

Christopher Muller, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Wyatt E. Bloomfield and William H. Shin, Deputy Attorneys General, for Plaintiff and Respondent.